H. M. Doolittle, Appellant, v. J. C. Murray & Co., J. C. Murray, E. T. Edgerly, J. W. Edgerly & Co., S. E. Magner, I. M. Magner, G. W. Logan, E. T. Dufur and Ralph Kilgore, Appellees.

**Sales:** CONTRACT IN WRITING: VARIANCE BY PAROL. A contract for
1  the sale of goods which specifically states the mutual promises and undertakings of the parties, describes the goods sold, the specific sum to be paid, the manner and terms of payment and that the same is to be an absolute sale and transfer of the property, cannot be shown by parol to have been intended as a mere mortgage or conveyance in trust.

**Contracts:** RATIFICATION: BREACH: DAMAGES. Although one cred-
2  itor made an unconditional purchase of his debtor's stock of goods agreeing in consideration therefor to pay other creditors with the balance to himself, and thereafter the debtor had no interest in or control over the same, yet the creditor's act in passing the title to one with whom the debtor had contracted to exchange it for land was a ratification of the act and the creditor was bound by the transaction; and upon his refusal to carry it out the debtor's measure of damages was the amount of the claims which the creditor agreed to pay and

such other damages as resulted from his refusal to accept the land.

**Principal and agent:** DEFAULT OF PRINCIPAL: LIABILITY OF AGENT. One contracting with an agent whose principal is disclosed cannot proceed against the agent to specifically enforce the contract the same as if it were made in his own right, even though the agent may have acted without authority and thereby subjected himself to an action for damages.

*Appeal from .Wapello District Court.—* HON. F. W. EICH-ELBERGER, Judge.

MONDAY, MAY 20, 1907.

THE opinion states the material facts.— *Reversed.*

*Chester W. Whitmore,* for appellant.

*McNett & McNett, Tisdale & Heindel,* and *James G. Bull,* for appellees.

WEAVER, C. J.— The somewhat peculiar complication of issues involved in this appeal can be most readily understood from a recitation of the facts, most of which are admitted, stated in narrative form and chronological order.

For some time prior to September 30, 1903, plaintiff, H. M. Doolittle, was engaged in the retail drug business at the town of Murray, Iowa. He had on hand a stock of goods which he estimated would invoice about $4,500. The business was unsatisfactory. He had suffered at least two or three losses by fire, his insurance had been canceled, his capital was all invested in the stock, and, as the sales were insufficient to enable him to meet his bills as they fell due, he was anxious to sell the property and business. Among his creditors, and, so far as the record discloses his principal creditors, were J. W. Edgerly & Co., wholesale druggists, at Ottumwa, Iowa, to whom he owed $591.37, and the Churchill Drug Company of Burlington, Iowa, to whom he owed $119.68. If there were any other creditors, this

proceeding is not complicated by their appearance or claims. After some correspondence with Edgerly & Co. plaintiff appeared at their store in Ottumwa on September 20, 1903, and negotiations were begun for some satisfactory adjustment of their business. After some discussion E. F. Edgerly, the credit man of the firm, went with plaintiff to consult counsel. At first it was proposed that plaintiff execute a mortgage on his stock, but this plan was rejected as inadmissible; it being thought that plaintiff's title should be entirely divested in order that valid insurance might be procured. It was then agreed that a new firm or partnership should be organized under the name of J. C. Murray & Co., with or through which firm the deal with plaintiff was effected. This firm consisted of J. C. Murray, an employé of Edgerly & Co., and E. F. Edgerly, its credit man above mentioned. For obvious reasons Edgerly & Co. as wholesale druggists, looking to the retail dealers of their territory for patronage, did not wish to appear publicly as themselves owning or conducting a retail business, and to avoid this objection the device of an independent partnership was adopted. A written contract was then entered into between plaintiff and J. C. Murray & Co. in language as follows:

This contract made and entered into by and between H. M. Doolittle, of Murray, Iowa, and J. C. Murray & Co., of Ottumwa, Iowa, this 30th day of September, 1903, witnesseth: That the said Doolittle has this day sold and transferred to said Murray & Co. his certain drug store, located in Dr. J. F. Hasty's building, on the north side of the railroad track on Maple avenue, in Murray, Iowa. The said stock consists of drugs, chemicals, notions, paints, oils, wall paper, patent medicines, cigars, tobacco, and all furniture and fixtures in said building, including soda fountain, show cases, stove, prescription case, and includes all the fixtures not owned by the landlord, J. F. Hasty; and this is to be an absolute sale and transfer, and said Doolittle warrants the title to all of said stock, fixtures, etc., to said Murray & Co., in consideration of which the said Murray & Co. hereby undertakes and agrees to assume and pay a certain bill or claim

of J. W. Edgerly & Co., of Ottumwa, Iowa, against the said Doolittle, for the sum of $591.37, also the claim of the Churchill Drug Co., of Burlington, Iowa, for the sum of $119.68; and they further agree that within a reasonable time, and as expeditiously as they can do so in a reasonable way, they will make sale of said entire stock for the best terms and price they can obtain, and that after deducting the amount of the aforesaid assumed bills and all expenses they may have incurred in and about the said stock over and above its net proceeds they will pay as further consideration the said purchase price received by them from the sale of the said goods. That in said expense shall be included all bills made by them in further conducting said business, and said Doolittle hereby transfers his unexpired lease on the premises where his store is located to said Murray & Co., and said Murray & Co. hereby agrees to pay all rents to accrue on the unexpired term. Any rents paid are to be included in the bill of expenses as well as any insurance paid by said Murray & Co. [Signed] H. M. Doolittle, J. C. Murray & Co.

Immediately upon the execution of this instrument one Haslach was employed and authorized to go to the town of Murray, where the goods were, and to take charge and control of the Doolittle stock and business in the name and behalf of Murray & Co., and conduct the same until it could be closed out by sale or other satisfactory disposition of the matter. There was also some talk or understanding between plaintiff and Murray & Co., the terms and extent of which are the subject of dispute, looking to effort on part of plaintiff to find a purchaser or make a sale of the stock. Haslach went to Murray on the same or following day, and Doolittle turned the stock over to him. Haslach applied to local agents for insurance, representing that Murray & Co. were sole owners, and that Doolittle had no interest in the property. On October 3, 1903, Edgerly wrote plaintiff, advising him of the address of certain parties who he said had an equity in farm land which they desired to exchange for the drug stock. On October 5, 1903, plaintiff, purporting

to act as agent for J. C. Murray & Co., entered into a written contract with S. E. Magner to exchange the stock for one hundred and sixty acres of land in Union county, Iowa. The land was priced at $8,100, which was to be paid by delivery of the drug stock invoiced at cost, and to aggregate not exceeding $5,000, and by assuming a mortgage incumbrance on the land of $3,500. Any difference which the invoice might develop in favor of either party was to be paid by the other in cash. This writing was signed by Magner, and by " H. M. Doolittle, Agent for J. C. Murray & Co.," and witnessed by Haslach. On the following day Doolittle wrote Edgerly that he had succeeded in making a trade of the stock for one hundred and sixty-two acres of land at $50 per acre, and had made application to a loan company to get the money to straighten up with. He then added: " Will you have the deed made to you and take land from you, or will you have the land deeded to myself and deposit deed in bank subject to your order until the land is sold or money raised by mortgage? I believe there can be something more than the purchase price obtained from the land." He swears that he inclosed a copy of the contract in this letter, but Edgerly is unable to recall having seen it until his visit to Murray hereinafter mentioned. To this letter Edgerly replied, saying: " We beg to acknowledge receipt of yours of the 6th advising us of your having made a trade of the J. C. Murray & Co., stock for a farm. We trust the matter may go through without complication. Inasmuch as J. C. Murray & Co. are acting in behalf of others, we think it would be more correct for them to receive the deed of the land, and then deed it back to you as matters are straightened up. We judge you will have to raise somewhere in the neighborhood of $4,500 in cash to enable you to pay the amount due the other party over and above the value of your stock, and enable you to take up your outstanding accounts." Haslach having first notified Edgerly of the intention to do so, an invoice of the stock was taken

by Hashlach, Doolittle, and a party representing Magner.
The value of the stock as thus fixed aggregated about $3,-
625.    At the completion of the invoice Haslach, for some
reason not explained, was dissatisfied with the situation of
affairs, and sent for Edgerly.    On the arrival of the latter
in Murray, Haslach informed him of the invoice and its
amount, to which Edgerly made no response or objection.
Prior to this time Magner and wife had executed a deed for
the land to J. C. Murray & Co., and deposited it in a bank
at the town of Murray to be delivered on completion of the
deal and payment of the cash difference between the agreed
price of the land and the invoice of the goods.    At this
visit, if not before, Edgerly saw the written contract, called
at the bank and learned of the deposit of the deed, and seems
to have been fully advised of all the steps taken up to that
date.    He made inquiries as to the location, quality, and
value of the land, and with plaintiff went over the figures
to ascertain the amount of money required to carry out the
deal.    They estimated that the aggregate of the mortgage
incumbrance with the cash difference and enough to cover
the claims assumed for Doolittle would represent an invest-
ment of $30 to $32 per acre.    The date of this visit was not
clearly shown, but there is ground for belief that it was not
earlier than October 11th nor later than October 15th.
Under date of October 10, 1903, Doolittle had written
Edgerly that Magner desired a bill of sale of the stock made
to E. S. Magner and G. W. Logan at the conclusion of the
invoice, and inclosed a blank form for that purpose.    He
closed by saying: " We have left the amount a blank which
you can give me written authority to fill in, the land to be
deeded to you as J. C. Murray & Co."    On the 12th the
bill was acknowledged and signed by J. C. Murray & Co.
and returned to Doolittle, with an inquiry whether he had
succeeded in making the loan, and saying they would want
time to get together an account of the expenses incurred.
The invoice having been completed, Doolittle completed and

delivered the bill of sale to Logan and Magner about October 15, 1903, and Haslach delivered to them the possession of the stock. This left nothing to prevent the delivery of the deed to Murray & Co. whenever the cash difference between the properties had been paid. As to what was done by the respective parties during the succeeding period of two months, the abstract contains no satisfactory account.

On December 15, 1903, Edgerly, writing to Doolittle in answer apparently to a letter not contained in the record, said: " Did you see the written opinion of Mr. Davenport as to the title, etc., of the land in question? The point we wished to mention in the letter to you was that we have a report which states that one of the parties with whom we are dealing at one time was indicted by a grand jury for forging deeds. As this transaction is in that same line, we thought it was very important that the title be investigated. Will you let us know whether you have seen Mr. Davenport's written opinion? We will probably not be able to give this matter very close attention until after the first of the year, as we are very busy with closing up details of the year's business. We trust you may make a sale. We suppose that between now and March 1st special efforts should be made, as about March 1st much land changes hands. If nothing is done within the next 30 or 60 days, we will see what we can do." The suggestion in this letter about a sale evidently has reference to a sale of the land, and not of the goods, as the latter had long since passed to Magner and Logan. To this letter plaintiff responded on December 17th that he had seen the abstract of title and Davenport's certificate thereon, and advised Edgerly to list the land with agents in Ottumwa. He then adds: " As the deal stands I have nothing to show an equity in the lands, and believe it no more than right that a note be given by you for say $800. That would be placing the land at the lowest figure any one would sell it; i. e., $37.50 per acre. Of course, I will do my part in attempting to make a sale; in fact, I will list it

with three real estate agents in this city [Des Moines] and others nearer the land. This shall be done to-day and the list of them sent you." On the following day Edgerly answered the letter as follows: "Dear Sir: Replying to yours of the 17th, do we understand that in that abstract that Mr. Davenport set forth, or rather, that the abstracter set forth, that there are no liens on the property, except those of which we know? As we have no property as yet to base a note on, we hardly think it would be just to expect us to give one. We think that the terms of the contract which you have with J. C. Murray & Co. are ample protection for you. We will list the property with one or two agents here. We do not know that we have any good description of it, however, and would suggest that you send us one. By description we do not mean the describing it by location, section, etc., but as to the number of acres under cultivation, the nature of the surface, the condition of the buildings, etc. By the way, do you know if the insurance on the buildings has been looked after?"

It would seem that other letters between the parties immediately following the last above quoted are not in evidence. The next shown is from J. C. Murray & Co. to plaintiff, bearing date January 8, 1904, in which they say: "We have yours addressed to E. F. Edgerly, and are looking after this matter. We have taken it up with our attorney. We think it may be necessary for us to view the land personally, or have one with whom we are acquainted inspect it, so we can have a satisfactory idea of its value from our own observation. We are of the opinion that Magner & Co. cannot hold both the stock and the land, though a rather nasty legal complication might come up if anything were attempted by them in that direction. At any rate, we are endeavoring to find out what are the facts in the matter, and will probably write again the first of next week." On January 22d Edgerly, after notifying plaintiff to join him, went to Union county and made a personal examination of

the land.    About the same time, and apparently on the same day, Edgerly with his attorney, interviewed Magner to whom the bank had redelivered the deed made to J. C. Murray & Co., and procured his agreement to deposit said deed as an escrow for another period of fourteen days from that date; the delivery to the grantees being conditioned upon the payment by J. C. Murray & Co. to the bank, for Magner, of the sum of $973.55.    There was also further provisions for a reduction from the above amount if a deficit was shown in the acreage of the land; but the details of this item are not material in the present case.

On January 29, 1904, Edgerly wrote to the plaintiff, replying to a letter which is not in the record, and for the first time in the correspondence distinctly repudiated for J. C. Murray & Co., any promise or obligation to put any money into the land, and insisted that, while nominally acting as their agent in the transaction, plaintiff was in fact acting for himself.    He also charged plaintiff with misrepresenting the value of his stock and informed him that Edgerly & Co. had not been paid their claim, and would proceed to enforce collection, if payment was not made promptly. On the following day Edgerly addressed Magner, saying: " When Mr. Work and I were at Murray with you about a week ago, there was some talk of possible exchange of farm and stock.    If you have any proposition on that line to make, we would suggest that it be made at once so there would be time to consider it, and, if accepted, to carry out any details connected with it."    Other letters passed between plaintiff and Edgerly on February 1st and 2nd, which are in effect disclaimers by both parties of any ultimate responsibility for the failure to complete the exchange of properties, and on February 8, 1904, J. C. Murray & Co. closed the correspondence by a letter saying: " We having decided that we could not accept the land on the terms required, inasmuch as we could not furnish the money to put up the bonus, have decided not to take the land, and therefore will

not pay any difference, nor are we in position to pay any jobbing bills of H. M. Doolittle & Co. This we have endeavored to make plain in the past, and is final in our case." Some months later, and before the commencement of this action, plaintiff made a written demand upon J. C. Murray & Co. and Edgerly & Co. for payment to him of the value of the drug stock less the amount of the claims which Murray & Co. had assumed to pay on his account. Murray & Co. have never paid or discharged the claim of J. W. Edgerly & Co., or that of the Churchill Drug Company. Indeed, the last-named creditor having begun proceedings against him to enforce collection, plaintiff has been compelled to discharge this claim himself at an expense of $149.10.

This action was begun at law August 4, 1904, making J. C. Murray & Co., J. T. Edgerly, J. C. Murray and J. W. Edgerly & Co. defendants to recover damages sustained by the plaintiff on account of the alleged failure of the defendants to perform the written contract first mentioned in the opinion. At an early stage in the proceedings the trial court ordered the plaintiff to implead and serve notice upon the parties claiming or appearing to claim an interest in the land or in the stock of goods exchanged for the land, and set down the issues for trial as in equity. The answer of the original defendants is to the effect that the contract sued upon, while an absolute sale in form, was, in fact, intended as a mortgage or trust agreement by which the legal title to the property was placed in J. C. Murray & Co., to secure the plaintiff's debt owing to J. W. Edgerly & Co., and that no obligation was assumed by J. C. Murray & Co. except to apply whatever they might realize out of the stock, in the manner provided in the contract. They further say that, while nominally acting as their agent in the attempt to dispose of the stock, plaintiff was, in fact, acting for himself, and that he alone is responsible for the losses sustained in that transaction. Magner, Logan, and Dufur appear and in a cross-bill set up the contract for exchange of prop-

erty, say that J. C. Murray & Co. were only nominal parties to said contract, and ask for its specific enforcement against the plaintiff. On trial of the several issues to the court a decree was rendered dismissing the plaintiff's petition as to all the defendants, also dismissing all the cross claims between the defendants, and taxing all costs ($162.90) to the plaintiff. Upon the cross-bill filed by Magner, Logan, and Dufur personal judgment was rendered in their favor against the plaintiff above for $1,450.29. It was further provided that, a deed of the land from Magner to plaintiff having been brought into court, the same should be delivered to plaintiff upon payment by him within six months of the date of the aforesaid judgment; but, in case he failed to make such payment within the said period, then a special execution issue for the sale of his interest in the land.

From this decree the plaintiff has appealed.

I. We have first to consider whether it is competent for the defendants Murray & Co. to plead or to prove that the written contract on which this action is based is not a contract of sale, but a mere mortgage or trust agreement for the benefit of certain creditors of the plaintiff; and, if this be answered in the affirmative, is it also competent for said defendants to plead or prove that the written promise of Murray & Co. to assume and pay the claims of Edgerly & Co. and the Churchill Drug Company was subject to a contemporaneous oral agreement that such promise and assumption of responsibility should be interpreted as nothing more than an undertaking to sell the goods, and apply the net proceeds of such sale to the payment of the claims mentioned? Stated in other words, can Murray & Co. be heard to say, " It is true we have undertaken in express written words to pay these claims in consideration of the sale to us of Doolittle's stock of goods, yet, according to our mutual understanding, not reduced to writing, the extent of our obligation was to take the title to said goods in trust

*1. SALES: contracts in writing: variance by parol.*

and apply the net proceeds of their sale to the satisfaction of these claims "? In attempting to answer these inquiries, it is well to note at the outset that neither party makes any charge or claim of fraud or mistake in the procurement, execution, or delivery of the contract, and neither party is asking for its reformation. The general rule of law which excludes testimony of prior or contemporaneous oral declarations and agreements to vary the terms or legal effect of a written contract is too elementary to permit of argument or citation of authorities. It is also well established that a deed purporting to transfer or convey title to property may be shown by parol to have been given and received as a mortgage whether the action be in equity or at law. *McAnnulty v. Seick,* 59 Iowa, 586; *Frick v. Kabaker,* 116 Iowa, 502. This rule is not altogether an exception engrafted upon the former; because, ordinarily speaking, a deed is not evidence of the contract between the parties, but is rather the consummation of a contract resting in parol or in another writing. *Trayer v. Reeder,* 45 Iowa, 272; *Saville v. Chalmers,* 76 Iowa, 325; *Bever v. Bever,* 144 Ind. 162 (41 N. E. 944); *Davis v. Hopkins,* 32 Pac. 70 (18 Colo. 153). But where any inconsistency is found between the terms of the preliminary contract and the deed which witnesses the consummation of the transaction, the latter will prevail. *Philbrook v. Emswiler,* 92 Ind. 590; *Cole v. Gray,* 139 Ind. 396 (38 N. E. 856).

It may be further conceded that the purpose for which a writing was delivered may generally be shown by parol; but this is subject to the restriction that the purpose thus shown must not be in contradiction of the express terms of such writing. *Courtwright v. Strickler,* 37 Iowa, 382; *Dickson v. Harris,* 60 Iowa, 727; *Blair v. Buttolph,* 72 Iowa, 31; *De Goey v. Van Wyk,* 97 Iowa, 492. These rules have been most frequently applied to conveyances of real estate, but have sometimes been invoked in the consideration of bills of sale of personal property. *Voorhies v. Hennesy,*

7 Wash. 243 (34 Pac. 931); *Seavey v. Walker,* 108 Ind. 78 (9 N. E. 347); *Frick v. Kabaker, supra.* But, where the writing is something more than a formal transfer of title, is executed by both parties, and contains mutual stipulations and provisions which they specifically undertake to observe, it is held with very general unanimity that parol evidence is not admissible.

With these general rules in view, let us look now to the terms of the contract in suit. In apt words, it witnesses the sale of plaintiff's stock of goods to Murray & Co., in consideration of which the latter " undertake and agree to assume and pay the bills and claims held against plaintiff by J. W. Edgerly & Co., $591.37, and the Churchill Drug Co., $119.68," and further to proceed to a sale of said stock as soon as practicable, and to pay over to plaintiff the net proceeds thereof after deducting the amount of the bills assumed and all expenses incurred in closing out said stock. To allow proof that notwithstanding the express agreements in the writing, plaintiff did not in fact sell the goods, and Murray & Co. did not, in fact, assume any personal obligation to pay what they promised to pay, is to affirm a proposition of law for which we think there exists no authority in principle or precedent. The books are not silent upon this question. For example, it has been held that, where a mortgage secures in express terms the payment of a given sum of money, parol evidence will not be admitted to show that the real purpose of the parties was to secure the performance of an oral agreement. *Adair v. Adair,* 5 Mich. 204 (71 Am. Dec. 779). Nor will such evidence be admitted to show that a mortgage given by an individual was in fact the mortgage of a partnership of which he was a member. *Jones v. Phelps,* 5 Mich. 218. One B. having acknowledged, in writing, the receipt of payment from G. for a private way across his land, it was incompetent for him to show by parol that the grant was understood to be personal only, and subject to revocation by the grantor.

*Wetherell v. Brobst,* 23 Iowa, 586. Where the parties have
in writing declared in clear and unambiguous terms the
purpose of their agreement, that declaration cannot be de-
nied or varied by proof of prior or contemporaneous parol
agreements. *Crane v. Bayley,* 126 Mich. 323 (85 N. W.
874). In the case of *Marsh v. McNair,* 99 N. Y. 176 (1
N. E. 660), we have a precedent which is in principle quite
applicable to the case at bar. There the plaintiffs by a
written assignment absolute in form, transferred to one
Gibson the title to certain policies of life insurance setting
forth in the writing that the consideration for such sale
was the agreement by Gibson to pay certain debts owing
by plaintiffs to different creditors therein named. There-
after the plaintiffs brought an action, alleging that the as-
signment was made as collateral security only, and sought
to recover the amount collected on the policy in excess of
the debt for which they claimed it had been pledged. The
Court of Appeals, after conceding the rule that an ordinary
deed or bill of sale may be shown by parol to have been in-
tended as security only, proceeds to say:

So, if this were simply an absolute assignment of the
policy to Gibson, there could be no question under the law
of this State that the plaintiff could be permitted to show
by parol that it was intended as collateral security. But
here was more than a simple assignment. . . . By its
terms the precise terms upon which the policy was assigned
are specified, and that is stated to be that Gibson was to
credit Chrales H. Marsh with the sum of $353.72 at his
bank, which sum was, in fact, an overdraft by Charles at the
bank, and that credit was made. Gibson was also to pay a
certain mortgage upon real estate which John R. Marsh
had conveyed to him, . . . and he was to indorse
$35.82 upon a note for $300 which he held against Charles
H. . . . This instrument was more than an assign-
ment. It contains what both parties agreed to. It shows
that the assignment was made for the purposes mentioned
and precisely what Gibson was to do in consideration
thereof. He became bound to do precisely what was speci-

fied for him to do, and he could have been sued by the assignors for damages if he had failed to perform. Hence the instrument is not a mere assignment or transfer of the policy. It is a contract in writing within the rule which prohibits parol evidence to explain, vary, or contradict such contracts. . . . It is believed that no case can be found where parol evidence has been received for the purpose of showing that such an instrument was given merely as collateral security, and not for the precise purpose mentioned in it. Without commenting upon the authorities, the following are ample to show that the evidence was not competent.

Citing 1 Greenl. Evidence section 275; *McCrea v. Purmornt,* 16 Wend. (N. Y.), 461 (30 Am. Dec. 103); *Kellogg v. Richards,* 14 Wend. (N. Y.), 117; *Goodyear v. Ogden,* 4 Hill. (N. Y.), 104; *Graves v. Friend,* 5 Sandf. (N. Y.), 568; *Coon v. Knap,* 8 N. Y. 402 (59 Am. Dec. 502); *Cocks v. Barker,* 49 N. Y. 107; *Hinckley v. Railroad Co.,* 56 N. Y. 429; *Van Bokkelen v. Taylor,* 62 N. Y. 105; *Shaw v. Ins. Co.,* 69 N. Y. 286; *Wilson v. Deen,* 74 N. Y. 531; *Eighmie v. Taylor,* 98 N. Y. 228. Still closer in point both in fact and in principle is the case of Thomas v. Scutt, 127 N. Y. 133 (27 N. E. 961). There the parties entered into a written contract by which Thomas sold and transferred to Scutt a certain raft of hemlock lumber for the agreed price of $728, the same to be applied in payment of a chattel mortgage held by Thomas on said lumber and other property. Defending against an action brought on this contract, Thomas sought to prove by parol that the real purpose and intention of the parties was that the lumber be turned out to him to secure the repayment of advances made by him to the plaintiff, and that he received the lumber under the express agreement and understanding that he should market the same and account to plaintiff for the proceeds after deducting all expenses and the amount of plaintiff's debt — all of which defendant expressed his willingness to do. Rejecting parol evidence of these alleged facts, and applying to the case the rule affirmed in *Marsh v. McNair, supra,* the court says:

The principle upon which parol evidence is held admissible to show that a simple assignment, though absolute in terms, was intended as security merely, is the supposed incompleteness of the instrument, and is not regarded as contradicting. the writing but as showing its purpose. *Truscott v. King,* 6 N. Y. 147; *Horn v. Keteltas,* 46 N. Y. 605. Where, however, instead of a mere transfer or assignment, there is a contract appearing on its face to be complete, with mutual obligations to be performed, you can no more add to or contradict its legal effect by parol stipulations preceding or accompanying its execution than you can alter it through the same means in other respects [citing Phil. Ev. (2 Cow. & Hill's Notes) 698, and other authorities]. . . . We regard this contract as complete upon its face. What element is wanting? If such a writing can be undermined by parol evidence, what written instrument is safe? How can a man, however prudent, protect himself against perjury, infirmity of memory, or death of witnesses? See, also, *McEnery v. McEnery,* 110 Iowa, 725.

The language above quoted is in all respects applicable to the contract now in suit. It is something more than a mere assignment or transfer of title to the stock of goods. It is a complete contract, stating specifically and in detail the mutual promises and undertakings of both vendor and vendee — describes the thing sold and transferred, states the names of the creditors whose claims the vendee agrees to pay, the specific sum to be paid to each, the manner in which the remainder of the purchase price is to be adjusted, and then, as if to foreclose any possible doubt as to the nature of the transaction, the parties insert in the writing these words: "And this is to be an absolute sale and transfer, and said Doolittle warrants the title to all said stock, fixtures, etc., to said Murray & Co." To quote again from the case last cited: "If such a writing can be undermined by parol evidence, what written instrument is safe?"

It is not difficult to justify the rule. that a writing which simply transfers the legal title to property may be shown by parol to have been given as a mortgage, because

the proof thus offered does not necessarily contradict the writing. But the defense here asserted is based upon parol proof of contemporary agreements which are wholly inconsistent and irreconcilable with the written stipulations. In writing, the parties say in express terms that the sale is absolute and not a mortgage, and that the vendees in consideration thereof will pay certain specific sums to certain named creditors of the vendor; but as witnesses they claim the right to testify that the sale was not absolute, but a mere method of securing the vendors' debt, and that they did not, in fact, undertake to pay anything except as they might obtain the money by a resale of the goods. Could renunciation and denial of a written contract be more complete? Where the writing does not purport to disclose the whole contract; where it seems not designed as a written statement of an agreement, but merely as an execution of some part or detail of an unexpressed contract; where it purports to state only one side of an agreement merely, and is the act of one of the parties only in the performance of his promise — in these and like cases the exception may properly apply and the oral agreement be shown. But, where the writing covers both sides of the contract, where it contains a definite agreement of bargain and sale, specifying the consideration, describing the subject, setting forth the mutual covenants and undertakings of both parties, such writing must be held to conclusively express their intentions. *Eighmie v. Taylor,* 97 N. Y. 288. Parol evidence is inadmissible to annex to a bill of sale or contract of sale any condition inconsistent with the conditions therein expressed. 17 Cyc. 645; *Davis v. Robinson,* 71 Iowa, 618; *Daly v. Kimball,* 67 Iowa, 132; *Fawkner v. Lew Smith Wall Paper Co.,* 88 Iowa, 169; *McCormick v. Markert,* 107 Iowa, 340; *Neal v. Flint,* 88 Me. 72 (33 Atl. 669); *Whitaker v. Sumner,* 20 Pick. (Mass.), 399; *Stevens v. Wiley,* 165 Mass. 177 (43 N. E. 177). In the last-cited precedent the court says that a conveyance absolute in form of real or personal property

may be shown to have been taken as collateral security, but in the case then under consideration the defendants having given a writing acknowledging the sale to them of certain property, and saying, "We are to credit Stevens $500 on our account against Stevens & Oldham," it was held not to be open to them to show by parol evidence that the agreement was something else. Authorities to this effect are very numerous and further citation is unnecessary.

Before leaving this topic, we may say that the conclusion that a sale, and not a mortgage was intended by the parties, is strengthened by the testimony of the defendants that mortgage security was at first discussed between them, but was abandoned because they understood that, unless the transfer was absolute, there would be difficulty in getting valid insurance. Hence the contract of sale and the definite expression therein of its absolute character. Had insurance been procured by Murray & Co. and loss incurred, can there be any doubt that said vendees would have insisted upon being considered the owners of the property? That an explicit declaration embodied in the writing declaring the sale to be absolute, and not a mortgage, will estop a party to impeach such declaration by parol proof. See *Burnside v. Terry,* 45 Ga. 621. We are bound to assume in making this declaration the parties were acting in good faith and with no intent to defraud. See, also, as bearing on the general question, *Grabfelder v. Vosburgh,* 85 N. Y. Supp. 633 (90 App. Div. 307); *Bass D. G. Co. v. Mfg. Co.,* 119 Ga. 124 (45 S. E. 980); *Richardson v. McConaughey,* 55 W. Va. 546 (47 S. E. 287); *Forsyth v. Castlen,* 112 Ga. 199 (37 S. E. 485, 81 Am. St. Rep. 28).

It follows from the foregoing that the finding of the trial court that the contract in suit may be treated as a mortgage only, and that appellees' promise to pay may be considered. as a mere undertaking to account for moneys acquired by a sale of the property cannot be upheld. For the same reasons which exclude parol proof to convert the

contract in suit into a mortgage, it is likewise incompetent by such proof to show that, instead of a sale according to the expressed terms of the writing, the agreement was one of trust.

II.   Having found that the contract in suit must be treated and enforced as a contract of sale according to its terms, we proceed to inquire concerning the rights of parties as affected by their subsequent dealings. Without again rehearsing these transactions, it is entirely clear to us that after the contract of sale was consummated plaintiff retained no authority or control over the goods.   The possession of the stock was promptly surrendered to Murray & Co.'s representative. Plaintiff had neither the right nor the power to sell or dispose of said stock or any portion thereof, save as power to do so was given by Murray & Co.   His contract with Magner & Logan was of no validity, save as it was ratified by Murray & Co.   As under the terms of the sale to Murray & Co. plaintiff was to receive the proceeds of the resale of the stock, he was naturally and properly interested in bringing about such a resale as soon as practicable and on the best obtainable terms, and Murray & Co. were evidently willing to avail themselves of his services in that behalf. It is conceded that at the time, or soon after the contract was made, there was some talk that plaintiff should endeavor to find a customer who would buy the stock or exchange other property therefor.   In making the attempted exchange with Magner & Logan, he acted in the name of Murray & Co., who, on being notified thereof, directed him to have the deed to the land made to themselves as grantees, and in furtherance of the deal made and forwarded to him a bill of sale of the stock to be delivered to Magner & Logan. The cash difference which must be paid to consummate the exchange was talked over, and the amount estimated between plaintiff and Edgerly, who represented Murray & Co. When plaintiff distinctly disclosed his claim and asked Mur-

2. CONTRACTS: ratification: breach: damages.

ray & Co. for a note of $800 for his margin in the transaction, appellees did not deny the relation of principal thus imputed to them, but objected that the trade was not yet consummated, and they had " as yet no property to base a note on." It is, moreover, of much significance that after Magner had refused to keep the matter of the conveyance of the land open any longer and had withdrawn his deed from the bank where it had been deposited in escrow, and when all the facts with reference to the proposed exchange were well known, Edgerly, for Murray & Co., after visiting and examining the land, went to Magner and induced him to redeposit the deed in escrow to be delivered to J. C. Murray & Co. upon the payment by them of the sum of $973.55. A few days later, having concluded not to take up the deed, they wrote plaintiff, saying: " We have decided we could not accept the land on the terms required, inasmuch as we could not furnish money to put up the bonus; have decided not to take the land, and therefore will not pay any difference, nor are we in position to pay any jobbing bills of H. M. Doolittle & Co." Surely in the face of this record it cannot be successfully maintained that no relation of principal and agent existed between Murray & Co. and the plaintiff. Such being the relation of the parties with reference to the exchange of the stock for the land, and plaintiff's act in negotiating such exchange having been ratified by Murray & Co. to the extent of transferring the title to the stock of goods to Magner & Logan, but permitting it to fail by their refusal to take the deed from escrow, we see no escape from the conclusion that the plaintiff is entitled to recover upon his contract.

But such recovery is not to be measured, as his counsel argue, by the value of the stock of goods sold by him. Murray & Co.'s undertaking was not to pay the market value of the goods, but to pay the claims of the two creditors named, and as much more, if anything, as might be realized on a sale of the goods after deducting the sum

paid as aforesaid and all expenses incurred.   It follows, we think, that plaintiff's recovery will be limited to the amounts which Murray & Co. expressly assumed and agreed to pay, if they have not paid the same, with such other damages, if any, as resulted to him from their refusal to accept the title to the land which was to be taken in exchange for the goods.   But, as he himself negotiated the exchange, if he overestimated the value of the land so that, after paying the incumbrance upon it and the cash difference agreed upon, there was no margin of profit in it, or if the margin of profit did not exceed the amount of the debts assumed by Murray & Co. and their expenses reasonably incurred in the transaction, then plaintiff suffered no recoverable damage because of their refusal to complete the exchange.   If, on the other hand, the reasonable market value of the land was in excess of the incumbrance upon it, added to the cash difference agreed upon and the amount of the indebtedness assumed by Murray & Co. and their proper expenses as aforesaid, plaintiff's recovery will be increased by the excess thus ascertained.

The testimony in the record is not such as to enable us to pass upon these questions of fact, and the cause must be remanded for their determination.   We may properly say at this point that one of the contentions of the appellant is that the court below erred in transferring the cause from law to equity for trial.   Assuming that the order was properly made, the conclusions we have announced serve to eliminate the issues of an equitable nature, and in our judgment the issues remanded for further hearing are triable by ordinary proceedings if either party shall demand it.

III.   As a necessary consequence of the conclusions already announced, the decree of the trial court upon the cross-bill in favor of Magner, Logan and Dufur must be reversed.   Even had we reached the opposite conclusion as to the controversy between plaintiff and Murray & Co., we think

3. PRINCIPAL AND AGENT: default of principal: liability of agent.

this decree could not be approved. The cross-petition-ers dealt with plaintiff as an agent only. The name of his principal was disclosed, and even if he acted without due authority and thereby exposed himself to an action for damages, we think there is no rule of the law of agency which enables them to treat him as a principal and specif-ically enforce the contract against him as if it were made by him in his own right. What may be the rights of the sev-eral appellees as between themselves we have no occasion to consider or determine.

The decree of the district court is reversed, and cause remanded for further proceedings not inconsistent with this opinion.— *Reversed.*