CHARLES MILLER, appellee, v. HARTFORD FIRE INSURANCE COM-
PANY, a corporation, appellee, and WESTERN ADJUST-
MENT AND INSPECTION COMPANY, appellant.

No. 49853.

(Reported in 102 N.W.2d 368)

666

April 5, 1960.

Hess, Pendleton & Thompson, of Sioux City, for appellant.

Thomas J. Griffin, of Sioux City, for plaintiff-appellee.

Harper, Gleysteen & Nelson and Shull, Marshall, Marks, Mayne & Vizintos, all of Sioux City, for defendant-appellee.

GARRETT, J.—A. B. Schario, owner of a house in Woodbury County, Iowa, notified the Woolridge Insurance Agency, Sioux City agent of the defendant Hartford Fire Insurance Company, his insurer, of a fire loss on his property. The agent referred the claim to Western Adjustment and Inspection Company, appellant, for investigation and report. When appellant's manager, Leroy Bean, received the claim he assigned it to Richard Brennan, an adjuster employed by appellant, who went to the premises and inspected the damage.

The owner told Brennan a contractor had estimated the damage at $5000 which Brennan thought was too high. Brennan then called plaintiff-appellee, Charles Miller, and asked him to inspect the property and submit a competitive estimate. Appellee later telephoned Brennan stating the damage was about $3500 which Brennan thought was also too high. The next day appellee submitted to Brennan a written estimate of $2995.90.

Appellee claimed Brennan told him he had the low bid and to proceed with the repairs. When the repairs were completed

the insurer and adjustment company refused to pay therefor, claiming Schario was responsible for the fire. Appellee then brought suit against the insurance company. When the company denied liability and the authority of the adjustment company to bind it in any way appellee amended his petition making the adjustment company a party defendant.

At the close of plaintiff-appellee's evidence the court, on motion of the insurance company, directed a verdict in its favor. The jury returned a verdict for plaintiff against the adjustment company and it has appealed from judgment on the verdict and the order sustaining the insurer's motion for directed verdict.

I. There is no dispute as to the amount in controversy. No objections were interposed to the court's instructions to the jury including the instruction that in the event of a verdict for plaintiff it should be for $3045.

II. Appellant contends the contract to repair the insured property was between plaintiff and Schario, the owner, and that it and the insurance company were not indebted to plaintiff on contract or otherwise in any amount. Whether there was a contract and who the parties thereto were was a question of fact for the jury.

Plaintiff testified that since 1936 he had been engaged as a general contractor in the construction, reconstruction and repair of dwelling houses. "Q. At whose request did you go to look at the property? A. I came back to my office and there was a phone call to call Mr. Brennan of the Western Adjustment." He knew Mr. Brennan always called him Dick; he had had several other prior dealings with the Western Adjustment and Inspection Company. "Q. Over what period of time? A. Oh, since 1936, the past twenty-two years." He had met Mr. Brennan about four years before when he first started as an adjuster and he had dealings with him in his capacity as an adjuster for that company before. "Q. Did you phone or give an estimate to Mr. Brennan? A. I called Mr. Brennan on the phone and told him that it was kind of a serious fire, and he says, well, he said to give me the figures to his office, and they would go from there. Q. Did you give Mr. Brennan a figure as to what it would cost, or what you would charge to restore the building? A. I did.

Q. What was that figure? A. It was in the $3000 figure, three thousand some odd dollars. I can't say exactly. It might have been $3100 or $3050. I had nothing in writing with him. I never ever gave a written contract in all my experience with adjusting. I followed the usual procedure I follow in connection with adjustments with this company. I sent Mr. Brennan the estimate. It was a written estimate somewhere between $3000 and $3100, or something like that. This was on the day after I looked it over. After I submitted the figure to him I next heard from him within a day or two after I had been out there. Q. All right, now what did he say when he called you on the phone? A. He said I was low bidder, and that I could proceed on those figures, but he wouldn't allow the painting on the outside. In response to this telephone conversation with Mr. Brennan, we started to work."

Plaintiff further testified that when he first went out to look at this fire loss he saw a Mr. Schario out there. He had never seen him before. He never knew him or heard of him before. He had never seen this house before. He first learned there had been a fire out there when Mr. Brennan called him on the telephone. "Q. Was this bid that you made for that construction job to include everything except painting? A. There was some basement work that he hired out to the lady of the house that he said he would pay her a dollar an hour if she would clean the house basement and I believe inside the cabinets and the dishes, and there was another man there that he hired to assist her. Q. Were you there when he did that? A. I was. He took—he told me not to figure the cost, he would hire them to do that. Q. Do you know whether he did or not? A. He did." Plaintiff had had negotiations with Mr. Brennan from time to time on other matters, too. When he completed the work he reported to Mr. Brennan or his company. After demands for payment he called Mr. Bean "* * * he told me well there wouldn't be too much to worry about because there was a mortgage on the property, and that I would get my money probably over a period of time." He stated he had no dealings with the insurance company, and he never had dealings with insurance companies. "Q. Was this transaction handled in substantially the same way as all other

loss and repairs of that kind? A. On about the same basis." He talked to no one other than Mr. Brennan or Mr. Bean concerning this job. All of the above testimony was received over the objection that it was incompetent under the statute of frauds. Passing this question for the moment, it is our opinion the jury could find from the evidence set out, ample support for its verdict against the adjustment company.

Appellant contends that under the interpretation of the evidence most favorable to appellee there was no valid offer, acceptance, consideration or mutual assent shown between said parties and that the terms of the alleged contract were so vague and indefinite as to render it void and unenforceable.

If these contentions were sustained by the evidence or lack of it we would be compelled to reverse the judgment of the trial court. Giving the evidence the most favorable interpretation it is entitled to it meets all of appellant's challenges. The transactions between the parties were handled "in substantially the same way as all other loss and repairs of that kind." The amount of the claim was not questioned. The jury could find from the evidence that all of plaintiff's dealings were with Brennan and Bean; that they represented they had authority to order the repairs; that the quality of the work was satisfactory; that plaintiff made an offer which was accepted; that he carried out the verbal contract on his part and that he thereby became entitled to the consideration or contract price.

■ "The determination that an agreement is sufficiently definite is favored. The courts will, if possible, so construe the agreement as to carry into effect the reasonable intention of the parties if that can be ascertained." 12 Am. Jur., Contracts, section 64, page 556.

The maxim, "id certum est quod certum reddi potest" applies. No claim is made that the repairs did not come up to the requirements of appellant. The appellant induced performance of the contract and led plaintiff to believe it had authority to make such agreement.

■ III. It is claimed the trial court erred in admitting evidence over timely objection, of any oral promise of appellant to answer for the debt or default of another, contrary to section

622.32 of the Code, known as the statute of frauds, which, so far as material here provides: "Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent: * *·* 2. Those wherein one person promises to answer for the debt, default, or miscarriage of another, * * *."

By its verdict the jury found appellant and not Schario owed the plaintiff. It follows, then, that appellant was not held to answer for the debt of Schario. Was it in a position to complain that it was held to answer for the debt of its principal, the insurer? We think not. The debt was incurred by appellant. If it acted without authority it should make good to plaintiff the injury he suffered by virtue of its having exceeded its authority. Plaintiff acted in complete reliance upon the representations of appellant. When the insurance company denied appellant's agency and authority to bind it, plaintiff, within his rights, brought appellant into the case as a party defendant. Appellant, through Brennan, employed and directed plaintiff to make the specified repairs for an agreed consideration thereby making it appellant's contract and debt, and it should not be heard to say that the relevant evidence was received in violation of the statute of frauds. Wheeler Lumber, Bridge and Supply Co. v. Anderson, 249 Iowa 689, 86 N.W.2d 912; Sultzer v. Lutz, 184 Iowa 1031, 169 N.W. 341. If it was a debt of the insurer, it was also an obligation of appellant, and the statute of frauds is not available to it as an exclusionary rule.

IV. Appellant also claims evidence of any contract should have been excluded under section 554.4 of the 1958 Code, which, so far as material, reads: "1. A contract to sell or a sale of any goods * * * shall not be enforceable by action unless the buyer shall accept part of the goods * * * so contracted to be sold or sold and actually receive the same or give something in earnest to bind the contract, * * *."

This section has no application here where the contract was fully performed. "It is only when no part of the purchase money has been paid, and no part of the property is delivered, that the rule has application. And when the delivery is made

to a third person, under the direction of the purchaser that such shall be done, that is sufficient to take the case from under the rule of the statute." Munroe v. Mundy & Scott, 164 Iowa 707, 710, 146 N.W. 819, 820; Leggett & Meyer Tobacco Co. v. Collier, Robertson & Hambleton, 89 Iowa 144, 56 N.W. 417; Starr v. Stevenson, 91 Iowa 684, 60 N.W. 217.

V. Appellant contends the court erred in sustaining Hartford Fire Insurance Company's motion for a directed verdict. The motion was based on four grounds: That the evidence affirmatively shows: 1. That appellant was not acting as its agent. 2. That any agreement made by appellant was beyond its authority. 3. That appellant "did not have actual authority, nor is there any showing of any apparent authority on the part of the Western Adjustment and Inspection Company to make any agreements as alleged by plaintiff." 4. That there was no agreement whereby appellant employed plaintiff to make the repairs.

"Actual authority may be delegated to an agent by words which expressly and directly authorize him to do a delegable act, or it may be implied from the facts and circumstances attending the transaction in question. Such implied authority may arise independently of any express grant of authority, as from some manifestation from the principal that the particular authority in question shall exist in the agent, or it may arise as a necessary or reasonable implication in order to effectuate other authority expressly conferred. Every delegation of authority includes by implication, whether the agency is general or special, all such incidental authority as is necessary, usual, and proper as a means of effectuating the main authority conferred. In other words, an agent expressly authorized to do a particular act or acts or conduct a particular transaction has implied authority to do acts which are incidental to, usually accompany, or are reasonably necessary to, the accomplishment or performance of the principal act or transaction delegated." 2 Am. Jur., Agency, section 86, page 70.

"If an act done by an agent is within the apparent scope of the authority with which he has been clothed, it matters not that it is directly contrary to the instructions of the principal; the latter will, nevertheless, be liable, unless the third person

with whom the agent dealt knew that he was exceeding his authority or violating his instructions." 2 Am. Jur., section 348, page 271.

In Emmert v. Jelsma & Holdebrand, 191 Iowa 424, 428, 182 N.W. 652, 654, this court, speaking through Evans, C. J., said:

"Assuming, therefore, that the defendants did exceed their authority in assuming to enter into the purported contract as agents for the vendor, and that they were, therefore, liable for the damages resulting to the plaintiff, were they liable for that measure of damage so stated in the instruction?

"It is elementary that an agent who purports to enter into a contract for a disclosed principal is not himself liable *on the contract* unless the terms of the contract itself provide for such liability. Doolittle v. Murray & Co., 134 Iowa 536; Willett v. Young, 82 Iowa 292. On the other hand, it is likewise elementary that the mere fact of an existing agency will not protect a wrongdoer from the natural consequences of his own wrongdoing. If one, by fraudulent representations, deceive another to his injury, he is liable in damages for such resulting injury, regardless of any question of agency for a third party. We will assume, also, for the purpose of this case that, if a purported agent falsely represent the scope of his authority and exceed his authority and thereby induce another to act in reliance upon his assumed authority to his injury, the purported agent is liable for damages naturally and proximately resulting therefrom to the injured party." See also McCann v. Clark, 166 Iowa 705, 148 N.W. 1025; 3 C. J. S., Agency, section 208, page 115.

Plaintiff knew he was dealing with an adjustment company and when asked if he knew "who was the insurance company that had the fire insurance on this house", he replied, "I believe I knew at the time, yes."

In its brief and argument the insurer stated: "The defendant-appellee, Hartford Fire Insurance Company, issued a policy of fire insurance to A. B. Schario. Said house was damaged by fire and the defendant-appellee * * * through its local agent referred the loss to Western Adjustment and Inspection Company for investigation. Richard Brennan, employee of the

defendant-appellant, Western Adjustment and Inspection Company, went to the premises and inspected the damages. Plaintiff-appellee, Charles Miller, inspected the property at the request of Brennan. A written estimate was submitted and a day or two later there was a telephone conversation between Charles Miller and Richard Brennan in which Brennan stated that Miller was the low bidder. Subsequently Miller proceeded with the repairs of the property and the work was completed within about thirty days. * * * It [appellant] had no authority to make any binding contracts or agreements."

From the above it is apparent appellant was admittedly the agent for the insurance company at least for certain purposes with reference to the loss involved here. The insurance company maintained the authority of the adjustment company was limited to investigating and reporting the damage with recommendations. Plaintiff offered evidence that this loss was handled just as previous ones had been with the same adjuster. The conduct of the adjuster, agent of the insurer, induced plaintiff to do the work.

"One who enters into a contract apparently in a representative capacity, but actually with no authority from his purported principal, or in excess of an existent authority, is personally liable to the other contracting party who has acted in good faith and in reliance on the false representations, unless the principal is estopped to deny his authority, * * *." 3 C. J. S., Agency, section 208, page 114.

In McCann v. Clark, supra, at pages 713, 714 of 166 Iowa, page 1028 of 148 N.W., it is said regarding the liability of an agent:

"If he was merely the agent of Clark, and acted in good faith toward the plaintiff, no recovery can be had against him, but if it should be found that he undertook to represent and bind Clark without authority, and Clark refuses to ratify his acts in that respect, then, upon familiar principles, he will himself be bound to make good the contract or respond in damages. * * *

"It is not necessary that plaintiff should make a case for a joint recovery against all the defendants in order to be allowed

to go to the jury. It is enough, to prevent his being thrown out of court, that he make sufficient showing to sustain a recovery against any one or more of them, and this is true whether the action be ex contractu or ex delicto." (Citing cases)

There was a sufficient showing to support the verdict against appellant, Western Adjustment and Inspection Company.

 VI. Appellant claims the trial court erred in submitting the issue of whether or not there was a contract between it and plaintiff for the reason, as it claims, that the evidence showed plaintiff made an election to proceed against Schario by filing a mechanic's lien and later purchasing the property and that his conduct amounted to an estoppel as to his claim against it.

Plaintiff first elected to proceed against the adjustment and insurance companies when he made repeated demands for payment of his claim. Payment being refused by the parties who induced him to reconstruct and repair the house, he took a precautionary measure and without legal advice filed a mechanic's lien against the property which he had improved. He took no court action to foreclose the lien. It is obvious he never intended to abandon his right of action against the defendants. If an election of remedies is binding, it must be the first election and not a later one which is binding. If one can withdraw the first election and make a later one or several later ones it follows that no election is binding. 18 Am. Jur., Election of Remedies, section 51, page 167. Filing the mechanic's lien, if an election at all, was the second, the first being to collect from the parties with whom he had a contract.

 No election is required as between consistent remedies. Plaintiff had a right to collect for what he had done, from the parties who had agreed to see he was paid, or, failing there, from the owner of the property the reasonable value of the repairs if prior liens and other matters did not defeat him. He could have joined Schario as a defendant under rule 24, R. C. P. Undoubtedly plaintiff had the right, as all creditors have, to resort to all the security he had. Hoskin v. West, 226 Iowa 612,

284 N.W. 809; Diagonal State Bank v. Nichols, 219 Iowa 342, 345, 258 N.W. 700, 702; 28 C. J. S., Election of Remedies, section 3, page 1063.

Just what acts amount to an election, as between inconsistent remedies, is not always easy to determine. The better rule seems to be that nothing less than the commencement of an action should amount to such an election. It is well stated in 18 Am. Jur., Election of Remedies, section 16, page 140, as follows:

"Acts prior to the actual commencement of legal proceedings indicating an intention to rely upon one remedial right do not constitute an election which will preclude the subsequent prosecution of an action or suit based upon an inconsistent remedial right, unless the acts contain the elements of an estoppel in pais." The same authority in the next section states: "There are, as will be seen, jurisdictions in which the position is taken that the mere commencement of an action is sufficient to constitute an election. In other jurisdictions the election is not considered decisive until the suit has proceeded to judgment, unless some benefit is taken by the plaintiff or some detriment is suffered by his adversary."

See also Kearney Milling & Elevator Co. v. Union Pac. R. Co., 97 Iowa 719, 66 N.W. 1059; 28 C. J. S., Election of Remedies, section 17, page 1094.

VII. The plaintiff did not appeal from the order of the trial court sustaining the defendant insurance company's motion for a directed verdict. The only evidence offered in behalf of the insurer was elicited by it on cross-examination of appellant's witnesses.

Mr. Brennan, appellant's adjuster, testified: "Q. Mr. Brennan, did you have authority from the Hartford Fire Insurance Company to order the repairs made? A. No. Q. What were you to do as far as the Hartford Fire Insurance Company was concerned on this loss? A. Submit what I and the assured agreed upon as a dollar and cent figure representing his loss, and request that they make payment to the insured. Q. And did you do that in this case? A. No."

Leroy Bean, manager of appellant, testified: "Q. Mr. Bean, insofar as the Hartford Fire Insurance Company is concerned what * * * was your authority with reference to this loss? A. The same limited authority we have always had, that is, to investigate a loss, make a report to the insurance company with our recommendations." He further said the adjustment company never submitted the closing report recommending payment because of the arson aspects.

In view of this testimony by responsible employees of appellant that they had no authority to order the repairs made, the trial court could do nothing other than hold as it did that there was a complete failure of proof of liability on the part of appellee Hartford Fire Insurance Company and we must affirm. —Affirmed.

All JUSTICES concur except OLIVER, J., not sitting.