# IN THE SUPREME COURT OF IOWA

No. 18–1227

Filed May 10, 2019

**SAMUEL DE DIOS,**

    Appellant,

vs.

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA** and **BROADSPIRE SERVICES, INC.,**

    Appellee.

---

Certified questions of law from the United States District Court for the Northern District of Iowa, Mark W. Bennett, Judge.

A federal district court certified a question of Iowa law in a bad-faith action brought by an injured worker against a workers' compensation carrier and a third-party claims administrator. **CERTIFIED QUESTION ANSWERED.**

Anthony J. Bribriesco of Bribriesco Law Firm, PLLC, Bettendorf, for appellant.

Jeana Goosmann and Anthony Osborn of Goosmann Law Firm, PLC, Sioux City, for appellees.

Keith P. Duffy of Nyemaster Goode, P.C., Des Moines, for amici curiae Iowa Defense Counsel Association and the American Insurance Association.

**MANSFIELD, Justice.**

A worker was injured on the job when his vehicle was rear-ended. He filed a claim for benefits with the workers compensation commissioner. Later, he filed a bad-faith action in the district court against his employer's workers' compensation carrier and its third-party administrator. The action was removed to federal court.

The federal district court has asked us to answer the following certified question of Iowa law: "In what circumstances, if any, can an injured employee hold a third-party claims administrator liable for the tort of bad faith for failure to pay workers' compensation benefits?"

In Iowa, the bad-faith cause of action arises from (1) the special contractual relationship between insurer and insured, (2) the specific statutory and administrative duties imposed on insurers, or (3) some combination of the two. In workers' compensation, we have emphasized the statutory and administrative duties of workers' compensation carriers. As we discuss herein, a third-party administrator does not possess these attributes that have led to the imposition of bad-faith liability. Accordingly, we answer the question as follows: under Iowa law, a common law cause of action for bad-faith failure to pay workers' compensation benefits is not available against a third-party claims administrator of a worker's compensation insurance carrier.

## I. Background Facts and Proceedings.

"When we answer a certified question, we rely upon the facts provided with the certified question," and therefore "restate the facts as set forth by the federal district court." *Baldwin v. City of Estherville*, 915 N.W.2d 259, 261 (Iowa 2018). The United States District Court for the Northern District of Iowa described the facts as follows:

## A. Factual Background

### 1. The parties

[Samuel] De Dios alleges that, at all material times, he has been a resident of Woodbury County, Iowa, and that he was employed by Brand Energy & Infrastructure Services. He alleges that Brand had a workers' compensation insurance policy with defendant Indemnity Insurance Company of North America, but that Indemnity "delegated its authority of investigating, handling, managing, administering, and paying benefits under Iowa Workers' Compensation Laws to [defendant] Broadspire Services, Incorporated." Amended Complaint, ¶ 4.

More specifically, De Dios alleges the following about Broadspire's duties and its relationship with Indemnity:

5. At all times material to the Petition, the INSURANCE COMPANY and BROADSPIRE were responsible for making timely payment of workers' compensation benefits to employees of the EMPLOYER, including SAMUEL. Plaintiff will refer to both the INSURANCE COMPANY and BROADSPIRE collectively as "the Defendants."

6. BROADSPIRE and the INSURANCE COMPANY are essentially one and the same entity for purposes of the instant action.

7. The INSURANCE COMPANY lacked the necessary support staff to investigate on-the-job injuries in Iowa, including SAMUEL's on-the-job injury.

8. The INSURANCE COMPANY lacked the necessary support staff that had the experience or knowledge to make an informed decision on whether to pay benefits pursuant to Iowa Workers' Compensation Laws.

9. The INSURANCE COMPANY obligated BROADSPIRE to provide actuarial services for workers' compensation claims, including SAMUEL's workers' compensation claim.

10. The INSURANCE COMPANY obligated BROADSPIRE to provide underwriting services for workers' compensation claims, including SAMUEL's workers' compensation claim.

11.     BROADSPIRE performed the tasks of a workers' compensation insurance company in Iowa.

12.     BROADSPIRE received a percentage of the premiums that the EMPLOYER paid to the INSURANCE COMPANY.

13.     BROADSPIRE's compensation package with the INSURANCE COMPANY was tied to the approval or denial of workers' compensation claims: BROADSPIRE received more of the EMPLOYER's premium as the payment of workers' compensation benefits decreased.

14.     BROADSPIRE had a financial risk of loss for workers' compensation claims it administered on behalf of the INSURANCE COMPANY, including SAMUEL's workers' compensation claim.

15.     The INSURANCE COMPANY had a financial risk of loss for workers' compensation claims that were administered by BROADSPIRE, including SAMUEL's workers' compensation claim.

16.     The INSURANCE COMPANY entered into a reinsurance agreement with BROADSPIRE for payments made on behalf of workers' compensation claims, including SAMUEL's workers' compensation claim.

Amended Complaint at ¶¶ 5-16.

### 2. *The accident and aftermath*

De Dios alleges that, on April 8, 2016, he was assigned by Brand to work on a construction site located on the private property of CF Industries. To enter the property, he had to drive past a security gate and a security guard. He alleges that, after [he] enter[ed] the property, a vehicle driven by Jonathan Elizondo crashed into the back of his vehicle, damaging his vehicle and causing him injuries, including a lower back injury. The collision was witnessed by the security guard at the gate, Tina Gregg. De Dios reported the collision and his work injury to Brand's safety manager, Ismael Barba. He alleges that Brand authorized him to choose whatever medical provider he would like to provide care for the work injury. De Dios chose to be treated at St. Luke's Hospital,

where Dr. Jeffrey O'Tool provided him with medical care for his work injury.

On April 11, 2016, De Dios returned to work with Brand, but his back pain worsened. On April 14, 2016, Brand sent De Dios home because of his work injury. On April 14, 2016, Brand authorized De Dios to choose whatever medical provider he would like to see to care for his work injury. On April 15, 2016, De Dios's family doctor, Alisa M. Olson, DO, treated De Dios for the work injury. De Dios alleges that, from April 8, 2016, through May 9, 2016, Brand refused to provide him with "light duty" work. He alleges that, from April 15, 2016, Indemnity and Broadspire knew or should have known that he had work restrictions as a result of his work injury; that Brand refused to provide "light duty work" within those restrictions; and that Indemnity and Broadspire were required to pay him Temporary Total Disability ("TTD") Benefits and/or Healing Period ("HP") Benefits until a determination of maximum medical improvement was made by a qualified medical expert.

### 3. *Denial of the claim*

De Dios alleges that Broadspire or, in the alternative, Indemnity made the decision to deny him workers' compensation benefits. He alleges that, prior to doing so, neither Indemnity nor Broadspire interviewed him, or interviewed or contacted the security guard, Tina Gregg, who had witnessed the accident, or his treating physicians, Dr. O'Tool and Dr. Olson. He alleges that the defendants' failure to contact these people violated an insurance industry standard of "Three-Point Contact" before denying him workers' compensation benefits. On June 9, 2016, De Dios filed a workers' compensation claim with the Iowa Workers' Compensation Commissioner against Indemnity and Broadspire. On August 23, 2016, Indemnity and Broadspire filed a joint Answer with the Iowa Workers' Compensation Commissioner and denied liability for De Dios's work injury. De Dios alleges that Indemnity and Broadspire did not convey to him the basis for their decision to deny his claim at that time, that they, in fact, had no reasonable basis for denying his claim, and that they knew or should have known that no reasonable basis existed to deny his claim.

**II. Standard of Review and Criteria for Answering a Certified Question.**

Regarding this Court's power to answer certified questions of law, Iowa Code section 684A.1 provides,

The supreme court may answer questions of law certified to it by the supreme court of the United States, a court of appeals of the United States, a United States district court or the highest appellate court or the intermediate appellate court of another state, when requested by the certifying court, if there are involved in a proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the appellate courts of this state.

Iowa Code § 684A.1 (2018).

We have therefore held,

It is within our discretion to answer certified questions from a United States district court. We may answer a question certified to us when (1) a proper court certified the question, (2) the question involves a matter of Iowa law, (3) the question "may be determinative of the cause . . . pending in the certifying court," and (4) it appears to the certifying court that there is no controlling Iowa precedent.

*Baldwin*, 915 N.W.2d at 265 (quoting *Roth v. Evangelical Lutheran Good Samaritan Soc'y*, 886 N.W.2d 601, 605 (Iowa 2016) (omission in original)).

In this case, the answer to the certified question will determine whether De Dios's claim against Broadspire can proceed, and it does not appear to us (nor did it appear to the federal district court) that there is any controlling Iowa precedent. We conclude we should answer the certified question.

### III. Analysis.

In *Dolan v. Aid Insurance Company*, we first recognized the tort of first-party insurer bad faith. 431 N.W.2d 790, 790, 794 (Iowa 1988) (en banc). There, the plaintiff filed suit against his insurer, claiming bad-faith failure to settle for the underinsured motorist policy limit. *Id.* at 791. We found it was "appropriate to recognize the first-party bad faith tort to provide the insured an adequate remedy for an insurer's wrongful conduct" because traditional breach of contract damages would not always

be adequate to compensate for bad faith and the alternative remedy of intentional infliction of emotional distress was inadequate due to its limited applicability. *Id.* at 794.

We also found that recognition of the tort was justified "by the nature of the contractual relationship between the insurer and insured." *Id.* We explained,

> Although we do not believe this relationship involves the same fiduciary duties as in the third-party situations, . . . we have frequently noted that insurance policies are contracts of adhesion. This is due to the inherently unequal bargaining power between the insurer and insured, which persists throughout the parties' relationship and becomes particularly acute when the insured sustains a physical injury or economic loss for which coverage is sought. Recognition of the first-party bad faith tort redresses this inequality.

*Id.* (citations omitted). We adopted the test for bad faith applied by the Wisconsin Supreme Court in *Anderson v. Continental Insurance Company*:

> To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.

*Id.* (quoting *Anderson*, 271 N.W.2d 368, 376 (Wis. 1978)). We ultimately reversed the district court's order denying the insurer's motion for summary judgment, finding as a matter of law that the insured had failed to show the lack of a reasonable basis for the insurer's actions under the *Anderson* test. *Id.* at 794–95.

Four years later, we decided that our holding in *Dolan* logically extended to workers' compensation. *Boylan v. Am. Motorists Ins.*, 489 N.W.2d 742, 744 (Iowa 1992). In *Boylan v. American Motorists Insurance Company*, we held that injured workers could pursue bad-faith claims against workers' compensation carriers. *Id.* There, we reversed an order dismissing a bad-faith tort claim brought by an employee against his

employer's workers' compensation carrier. *Id.* at 742, 744. The district court had found "the relationship between an injured employee and the employer's workers' compensation carrier" was unlike the insurer/insured relationship in which we had recognized tort liability for bad faith. *Id.* at 742. The district court relied on our reasoning in *Long v. McAllister*, which held,

> The insurer has a fiduciary duty to the insured but an adversary relationship with the victim. The effect of the policy is to align the insurer's interests with those of the insured. In meeting its duty to the insured, the insurer must give as much consideration to the insured's interests as it does to its own.

*Boylan*, 489 N.W.2d at 743 (quoting *Long*, 319 N.W.2d 256, 262 (Iowa 1982)). The district court had also observed that "an employer or workers' compensation insurance carrier is not required to pay weekly benefits or to pay medical service providers prior to the time the industrial commissioner has determined the employee's entitlement to benefits." *Id.*

We found, however, that Iowa statutes and the Iowa administrative code placed obligations on insurers. *Id.* We recognized that Iowa Code section 86.13 (1991) imposed "an affirmative obligation on the part of the employer and insurance carrier to act reasonably in regard to benefit payments . . . ." *Id.* We also noted section 85.27 established an "affirmative obligation to furnish medical and hospital supplies to an injured employee," and "although [this] statute speaks only of the obligation of the employer, the commissioner's regulations consign these obligations to the employer's insurance carrier." *Id.*[1] The regulations at issue were Iowa Admin. Code r. 876—2.3 and r. 876—4.10.[2] *Id.* Rule 876—2.3 states,

---

[1] Notably, the present version of Iowa Code section 85.27 more expressly places obligations on the carrier as well as the employer. *See* Iowa Code § 85.27(3) (2018).

[2] Cited as 343 Iowa Admin. Code 2.3, 4.10.

**Representative within the state.** *All licensed insurers,* foreign and domestic, insuring workers' compensation and *all employers relieved from insurance pursuant to Iowa Code section 87.11* shall designate one or more persons geographically located within the borders of this state, which person or persons shall be knowledgeable of the Iowa Workers' Compensation Law and Rules and shall be given the authority and have the responsibility to expedite the handling of all matters within the scope of Iowa Code chapters 85, 85A, 85B, 86, and 87.

The Iowa workers' compensation commissioner shall be advised by letter of the name, address, and telephone number of each of the persons so designated. Any change in the identity, address or telephone number of the persons so designated shall be reported to the Iowa workers' compensation commissioner within ten days after such change occurs.

(Emphasis added). Rule 876—4.10 states,

**Insurance carrier as a party.** Whenever *any insurance carrier* shall issue a policy with a clause in substance providing that jurisdiction of the employer is jurisdiction of the insurance carrier, the *insurance carrier* shall be deemed a party in any action against the insured.

This rule is intended to implement Iowa Code section 87.10.[3]

(Emphasis added).

Under *Boylan,* the predominant justification for recognizing a bad-faith tort against workers' compensation carriers was the existence of certain "affirmative obligations" placed upon them by our statutory and

---

[3]Iowa Code section 87.10 states,

**Other policy requirements.**

Every policy issued by an insurance corporation, association, or organization to insure the payment of compensation shall contain a clause providing that between any employer and the insurer, notice to and knowledge of the occurrence of injury or death on the part of the insured shall be notice and knowledge on the part of the insurer; and jurisdiction of the insured shall be jurisdiction of the insurer, and the insurer shall be bound by every agreement, adjudication, award or judgment rendered against the insured.

Iowa Code § 87.10 (2018).

regulatory scheme. *See* 489 N.W.2d at 743; *see also* Joel E. Fenton, *The Tort of Bad Faith in Iowa Workers' Compensation Law*, 45 Drake L. Rev. 839, 847 (1997) ("This bundle of statutory and administrative obligations imposed on the insurance carrier creates a *Dolan*-like relationship between claimant and insurance carrier, which brings it into the circle of first-party relationships."). We also noted that the exclusive remedy defense found in Iowa Code section 85.20 (1991) was not available to insurance carriers.[4] *See Boylan*, 489 N.W.2d at 743–44 (citing *Tallman v. Hanssen*, 427 N.W.2d 868, 870 (Iowa 1988) ("This court . . . recognized that the exclusive remedy provision of our workers' compensation act is applicable only to claims against the employer and does not extend to the employer's compensation insurer.")).

We extended the workers' compensation bad-faith tort in *Reedy v. White Consolidated Industries, Incorporated,* to include self-insured employers. 503 N.W.2d 601, 603 (Iowa 1993). We explained,

---

[4]Iowa Code section 85.20 currently reads as follows:

**85.20 Rights of employee exclusive.**

The rights and remedies provided in this chapter, chapter 85A, or chapter 85B for an employee, or a student participating in a work-based learning opportunity as provided in section 85.61, on account of injury, occupational disease, or occupational hearing loss for which benefits under this chapter, chapter 85A, or chapter 85B are recoverable, shall be the exclusive and only rights and remedies of the employee or student, the employee's or student's personal or legal representatives, dependents, or next of kin, at common law or otherwise, on account of such injury, occupational disease, or occupational hearing loss against any of the following:

1. Against the employee's employer.

2. Against any other employee of such employer, provided that such injury, occupational disease, or occupational hearing loss arises out of and in the course of such employment and is not caused by the other employee's gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another.

Iowa Code § 85.20(1), (2) (2018).

A self-insured employer under the Workers' Compensation Act is not an employer who fails to secure insurance against workers' compensation liability. Without more, an employer who fails to secure insurance against such claims merely waives the protection of the act against common-law claims. Iowa Code § 87.21 (1993). To be a qualified self-insured employer under the act, it is necessary to voluntarily assume a recognized status under the workers' compensation laws as an insurer. Iowa Code § 87.4 (1987). For purposes of a bad-faith tort claim, we see no distinction between a workers' compensation insurance carrier for an employer and an employer who voluntarily assumes self-insured status under the act.

*Id.*

Then in *Bremer v. Wallace*, we answered the following question in the negative: "Does Iowa recognize a common-law claim for bad-faith refusal to pay workers' compensation benefits by an uninsured employer?" 728 N.W.2d 803, 804, 806 (Iowa 2007). Addressing *Dolan, Boylan,* and *Reedy*, we found,

The common thread in these decisions is the defendant's status as an insurer, or in the case of a self-insured employer, the substantial equivalent of an insurer. This status reflects and is consistent with the rationale underlying our decision in *Dolan*.

*Id.* at 805. We concluded that an uninsured employer is unlike an insurer or self-insured employer:

A self-insured employer must meet precise requirements to acquire that standing. Under section 87.4, [(2001)] "groups of employers by themselves or in an association with any or all of their workers, may form insurance associations," as provided in that statute "[f]or the purpose of complying with [chapter 87]." Iowa Code § 87.4. These "self-insured associations" must submit a plan to the insurance commissioner for approval. *Id.* Approval is conditioned on meeting rigorous financial requirements. *See* Iowa Admin Code. r. 191–56.3. Once a certificate of approval has been issued by the insurance commissioner, "the workers' compensation self-insurance association" is authorized "to provide workers' compensation benefits." *Id.* r. 191–56.8(1). Thereafter, the association is subject to the continuing supervision of the insurance commissioner. *Id.* rs. 191–56.9, 191–56.13.

*Id.* (second alteration in original).  We continued,

> The defendant in this case stands in a much different position.  He did not purchase workers' compensation insurance or join a self-insurance association.  Thus, he is not an insurer, nor is he the substantial equivalent of an insurer.  Consequently, the actual issue in this case is whether bad-faith tort liability for failing to pay workers' compensation benefits should be imposed under circumstances that do not involve an insurer/insured relationship.

*Id.* at 806.  We held that it should not be.  *Id.*

To summarize, we extended bad-faith liability to workers compensation carriers because the law imposed certain affirmative obligations on *both* employers *and* insurance carriers, and the employer's exclusive remedy defense was not available to carriers.  *Boylan*, 489 N.W.2d at 743–44.  We then found that bad-faith liability could extend to a self-insured employer because the statutory requirements and administrative oversight exercised over self-insured employers rendered them the substantial equivalent of insurers.  *Reedy*, 503 N.W.2d at 603.  Thus, we characterized the key inquiry as whether an insurer/insured relationship existed between the plaintiff and defendant.  *Bremer*, 728 N.W.2d at 806.

In other decisions, we have amplified these points.  We have reemphasized the statutory basis within Iowa Code section 86.13 for the bad-faith claim based on delayed payment of benefits.  *See Gibson v. ITT Hartford Ins.*, 621 N.W.2d 388, 397 (Iowa 2001) (en banc).  We have explained that workers' compensation bad-faith claims are considered "first-party bad faith" claims because of their statutory and regulatory genesis.  *McIlravy v. N. River Ins.*, 653 N.W.2d 323, 329 n.2 (Iowa 2002).  As we put it, "[W]hen first adopting the bad faith cause of action in the workers' compensation context, we determined that such a suit is more accurately considered as one for first-party bad faith given 'the obligations

that [Iowa Code §§ 86.13, .27] [(1999)] and administrative regulations place on the insurer.' " *Id.* (first alteration in original) (quoting *Boylan*, 489 N.W.2d at 743).

We have also held that workers' compensation bad-faith claims are subject to the statute of limitations for "other actions," not personal injury actions, because of their statutory grounding. *See Brown v. Liberty Mut. Ins.*, 513 N.W.2d 762, 764–65 (Iowa 1994). "Brown's bad-faith claim, as noted in *Boylan*, rests on Liberty Mutual's alleged breach of its statutory good-faith obligation to pay benefits in advance of a specific directive by the industrial commissioner." *Id.*

To sum up: "[O]ur decisions indicate it is the nature of the workers' compensation insurer's relationship with the insured employees and corresponding statutory duties that give rise to bad-faith tort liability." *Thornton v. Am. Interstate Ins.*, 897 N.W.2d 445, 463 (Iowa 2017). Thus, in *Thornton*, we reversed a finding that an insurer had opposed an employee's commutation petition in bad faith, noting, "Commutation is unlike the payment of weekly benefits in which the statute *commands* the employer (or insurer) to take action and, thus, establishes the type of statutory duty for which a willful and deliberate breach can give rise to bad-faith liability in the workers' compensation field." *Id.* at 469.[5]

When we consider these existing grounds for bad-faith liability in the workers' compensation field, it is difficult to see how they would apply to third-party administrators. A third-party administrator is not in an insurer/insured relationship with anyone. *See Bremer*, 728 N.W.2d at 806. And unlike a self-insured employer, a third-party administrator does

---

[5]While making this observation, we elected "to decide this case based on the factual record presented, without foreclosing the possibility that a bad-faith claim may arise for resisting commutation under different facts." *Thornton*, 897 N.W.2d at 468.

not have to meet rigorous financial requirements and is not under the ongoing supervision of the workers' compensation commissioner. *Id.* at 805–06.

Our workers' compensation statutes also do not impose "affirmative obligations" on third-party administrators as they do on insurers. *Cf. Boylan*, 489 N.W.2d at 743. The Iowa workers' compensation law *refers* to third-party administrators, and thus confirms that the Iowa legislature was aware of their role. *See* Iowa Code § 85.65A(3)(*e*) (2018) (providing that third-party administrators are not entitled to a commission for collecting the second injury fund surcharge); *id.* § 86.45(2)(*e*), (*h*) (allowing third-party administrators access to confidential information); *id.* § 87.11E(2)(*c*)–(*e*), (*f*) (making third-party administrators subject to penalties for filing false financial information). Yet this law imposes no obligations on them relative to the handling of workers' compensation claims. This shows that our legislature recognized a distinction between insurers and third-party administrators, and opted to impose "affirmative obligations" only on the former. *See Boylan*, 489 N.W.2d at 743. Our statutes do not define "insurer" as including third-party administrators. *See* Iowa Code chs. 85, 86, 87. In sum, under the laws of Iowa and the facts of this case, the third-party administrator is not an insurer, nor is it the substantial equivalent of an insurer.

It is true that the exclusive remedy provision in Iowa Code section 85.20 logically would not bar a claim against a third-party administrator, just as it does not bar a claim against a workers compensation carrier. *See Boylan*, 489 N.W.2d at 743–44. But that observation merely clears away a potential *obstacle* to such a claim; it does not provide an *affirmative reason* for recognizing such a claim when Iowa workers' compensation law

does not impose any relevant statutory duties on third-party administrators.

De Dios raises the concern that the workers' compensation carrier could "completely delegate its authority to a third-party administrator and that third-party administrator [could] arbitrarily deny coverage and delay payment of a claim to an injured worker with minimal consequences . . . ." Yet any insurer—not just a workers compensation carrier—can delegate its duties to a third party. This doesn't give the insurer a free pass for two reasons. First, if the third party is an agent, then vicarious liability applies. *See Miller v. Hartford Fire Ins.*, 251 Iowa 665, 672–73, 102 N.W.2d 368, 373 (1960) ("If an act done by an agent is within the apparent scope of the authority with which he has been clothed, it matters not that it is directly contrary to the instructions of the principal; the latter will, nevertheless, be liable, unless the third person with whom the agent dealt knew that he was exceeding his authority or violating his instructions." (quoting 2 Am. Jur. *Agency* § 348, at 271) (1936)). Second, the nondelegable duties imposed by Iowa statutes and administrative regulations remain on the carrier regardless of any attempt to pass them to a third party. As Couch on Insurance explains,

> An insurer cannot delegate its duty of good faith. Therefore, an agent of the insurer, while acting on the insurer's behalf by carrying out the insurer's contractual obligations, is under the same duty of good faith as the insurer itself. Under varying circumstances, the good faith requirement has been held to also apply to attorneys of the insured.

> This duty, however, only runs so far. While an insurer's agent may be subject to the insurer's duty of good faith, the agent does not also incur personal liability to the insured. The lack of contractual privity prevents courts from finding such liability, even in cases where the agent in question is a reinsuring subsidiary.

14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 198:17, at 198-38 to 198-39 (3d ed. 2018 Update) (footnotes omitted).

Moving outside Iowa and relying on caselaw from other jurisdictions can be problematic because many jurisdictions—approximately half—do not recognize common law bad-faith claims against a workers' compensation *carrier*. *See* Steven Plitt, *A Jurisprudential Survey of Bad Faith Claims in the Workers' Compensation Context*, 18 Conn. Ins. L.J. 451, 452–457 (2012). Not surprisingly, these jurisdictions do not allow third parties to be sued for bad faith in the workers' compensation context, either. *See, e.g., Almada v. Wausau Bus. Ins.*, 876 A.2d 535, 538–40 (Conn. 2005) (holding a bad-faith action against a workers' compensation carrier's third-party administrator was foreclosed by an earlier ruling barring such an action against carriers themselves); *Carpenter v. Sw. Med. Examination Servs., Inc.*, 381 S.W.3d 583, 588 (Tex. App. 2012) (holding that a bad-faith claim against an administrative services firm was barred by Texas precedent disallowing bad-faith claims against workers' compensation carriers themselves).

De Dios asks us to follow the approach of Colorado, the only jurisdiction that to our knowledge has allowed bad-faith claims against third-party administrators or other entities retained by workers compensation carriers. In *Scott Wetzel Services, Inc. v. Johnson*, the Colorado Supreme Court held the bad-faith tort was available against independent claims adjusters. 821 P.2d 804, 811 (Colo. 1991). The court explained,

> [A]n independent claims adjusting company . . . acting on behalf of a self-insured employer owes a duty of good faith and fair dealing to an injured employee in investigating and processing a workers' compensation claim even in the absence of contractual privity with the employee.

*Id.* at 813. Yet the court was very clear that this duty derived from Colorado's statutory and regulatory scheme governing workers' compensation:

> The duty of good faith and fair dealing owed by insurers and self-insurers to workers' compensation claimants is rooted in the Act. The regulations promulgated under the Act specifically contemplate the use of claims administration services by self-insured employers as an important part of the scheme for delivery of workers' compensation benefits by self-insured employers. . . . [The] . . . regulations . . . require that "[e]ach permit holder [i.e., self-insured employer] shall have within its own organization ample facilities and competent personnel to service its own program with respect to claims and administration or *shall contract with a service company to provide the services.*"
>
> The self-insurer regulatory scheme therefore specifically envisions the use of independent claims administration services to provide benefits. . . . The role of a claims adjusting service, therefore, derives not solely from its contract with the self-insured employer, but is based on statute and regulation as part of the benefit-delivery process.

*Id.* at 811–12 (second and third alteration in original) (emphasis in original) (citations omitted) (quoting 7 Colo. Code Regs. § 1101-4:3 (1990)). The court further elaborated in a footnote:

> For the purpose of our analysis it is not significant whether the claims adjusting service is an independent contractor or an agent of the employer. It is the statutory and regulatory structure and the adjuster's participation in the investigation and processing of claims that give rise to the duty and not the contract between the employer and claims adjusting service, or the law of principal and agent.

*Id.* at 812 n.10. Iowa does not have the same statutory and regulatory scheme.

In any event, Colorado is one of the relatively few jurisdictions that allow claims against third-party administrators generally, i.e., outside the workers compensation realm. *See Farr v. Transamerica Occidental Life Ins. Co. of Cal.*, 699 P.2d 376, 385–86 (Ariz. Ct. App. 1984) (finding that an

entity that collected premiums, handled claims according to the insurer's guidelines, and received a commission on premiums collected could be sued in bad faith notwithstanding a lack of privity with the insured); *Cary v. United of Omaha Life Ins.*, 68 P.3d 462, 469 (Colo. 2003) (en banc), *as modified on denial of reh'g* (May 19, 2003) ("When a third-party administrator performs many of the tasks of an insurance company and bears some of the financial risk of loss for the claim, the administrator has a duty of good faith and fair dealing to the insured . . . ."); *Wathor v. Mut. Assur. Adm'rs, Inc.*, 87 P.3d 559, 563 (Okla. 2004) ("In a situation where a plan administrator performs many of the tasks of an insurance company, has a compensation package that is contingent on the approval or denial of claims, and bears some of the financial risk of loss for the claims, the administrator has a duty of good faith and fair dealing to the insured."); *Merriman v. Am. Guarantee & Liab. Ins.*, 396 P.3d 351, 360 (Wash. Ct. App. 2017) (finding that an independent claims administrator can be sued for bad faith because it is subject to the same relevant statutory duties as an insurer); *but see Meineke v. GAB Bus. Servs., Inc.*, 991 P.2d 267, 270–71 (Ariz. Ct. App. 1999) ("Creating a separate duty from the adjuster to the insured would thrust the adjuster into what could be an irreconcilable conflict between such duty and the adjuster's contractual duty to follow the instructions of its client, the insurer."); *Riccatone v. Colo. Choice Health Plans*, 315 P.3d 203, 207 (Colo. App. 2013) ("[A]bsent a financial incentive to deny an insured's claims or coerce a reduced settlement, a third party that investigates and processes an insurance claim does not owe a duty of good faith and fair dealing to the insured."); *Trinity Baptist Church v. Bhd. Mut. Ins.*, 341 P.3d 75, 81 (Okla. 2014) ("[T]his Court will only apply the duty of good faith and fair dealing to a third party stranger to the insurance

contract when the third party acts so like an insurer that it develops a special relationship with the insured . . . .").

Iowa has not taken that step. And most jurisdictions to have considered the issue have declined to recognize bad-faith claims against third-party administrators and other entities that are not in privity with the insured. *See Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 640–41, 641 n.11 (7th Cir. 2015) (finding that Indiana law does not impose a duty running from a claims adjuster to an insured and that this is "the rule adopted by the majority of American jurisdictions"); *The William Powell Co. v. Nat'l Indem. Co.*, 141 F. Supp. 3d 773, 782–83 (S.D. Ohio 2015) ("Ohio law most strongly points to the conclusion that, absent privity, an insured may not sue a third-party claims administrator for adjusting its claim in bad faith."); *McLaren v. AIG Domestic Claims, Inc.*, 853 F. Supp. 2d 499, 511 (E.D. Pa. 2012) (noting that Pennsylvania does not allow bad-faith claims against third-party administrators); *Simmons v. Cong. Life Ins.*, 791 So.2d 360, 365–66 (Ala. Civ. App. 1998) (affirming summary judgment in favor of a third-party administrator on a bad-faith claim based on lack of privity), *aff'd in part, vacated in part, rev'd in part on other grounds, Ex Parte Simmons*, 791 So.2d 371 (Ala. 2000); *Sanchez v. Lindsey Morden Claims Servs., Inc.*, 84 Cal. Rptr. 2d 799, 803 (Ct. App. 1999) ("Our decision is consistent with the majority of cases in other states, which hold that an independent adjuster hired by the insurer owes no duty of care to the insured."); *Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins.*, 586 S.E.2d 586, 588 (S.C. 2003) (holding that "no bad faith claim can be brought against an independent adjuster or independent adjusting company" due to the lack of privity); *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 697–98 (Tex. 1994) (finding that a claims adjustment firm could not be sued in bad faith by the injured employee

because it was not part of the special relationship among the employee, the employer, and the insurer); *Carpenter*, 381 S.W.3d at 588–89 (summarizing Texas authority that forecloses actions against adjusting and administrative services firms for bad faith because of a lack of privity); *Hamill v. Pawtucket Mut. Ins.*, 892 A.2d 226, 230 (Vt. 2005) ("We concur with the majority view that public policy considerations do not favor creating a separate duty on the part of independent adjusters that would subject them to common-law tort actions by insureds who have suffered economic loss as the result of allegedly mishandled claims.").

Various policy reasons have been given for this majority rule. "An adjuster owes a duty to the insurer who engaged him. A new duty to the insured would conflict with that duty and interfere with its faithful performance. This is poor policy." *Sanchez*, 84 Cal. Rptr. 2d at 802. Also, "in most cases this [new duty] would be redundant, since the insurer also would be liable for unreasonable investigation or claims handling." *Id.* We have already noted this latter point.

In the workers compensation field, our precedent holding the compensation carrier to a duty of good faith and fair dealing vis-à-vis the injured worker rests upon statutes and regulations directed specifically at the carrier. *See Thornton*, 897 N.W.2d at 463; *McIlravy*, 653 N.W.2d at 329 n.2; *Gibson*, 621 N.W.2d at 397; *Brown*, 513 N.W.2d at 764–65; *Boylan*, 489 N.W.2d at 743. These statutes and regulations do not apply to third-party administrators. Thus, if we were going to begin recognizing bad-faith claims against insurance intermediaries, as opposed to insurers themselves, workers compensation would be an unusual place to start.

De Dios asks us to follow the Colorado approach. That is, he urges us to hold that when a third-party administrator "acts sufficiently like an insurer," that administrator can be sued for bad faith as if it were an

insurer. But this area of law already has a workable bright line in our view—a line established by the legislature. Iowa Code sections 87.1, 87.4, and 87.11 delineate the entities that act as insurers under our workers compensation system.[6]

### IV. Conclusion.

For the foregoing reasons, we have answered the certified question as stated above. We therefore return the case to the United States District Court for the Northern District of Iowa for further proceedings consistent with this opinion.

**CERTIFIED QUESTION ANSWERED.**

All justices concur except Appel and Wiggins, JJ., who dissent.

---

[6]Citing to *Bremer*, De Dios argues that any entity that is "the substantial equivalent of an insurer" should be liable in bad faith. *See Bremer*, 728 N.W.2d at 805. But this language needs to be read in context. *Bremer* was making the point that *under the workers compensation law*, a self-insured employer is the substantial equivalent of an insurer in terms of its statutory and regulatory duties. *See id.* That is not true of a third-party administrator.

**APPEL, Justice (dissenting).**

In this case, a federal court has asked us to decide whether a third-party administrator may be subject to liability for the tort of bad faith in the handling of a workers' compensation claim. The majority believes there is no basis in Iowa law for extending bad-faith liability to third-party administrators in the workers' compensation setting. I disagree.

**I. The Nature of the Problem: Outsourcing the Insurance Function.**

Although resisted fiercely for decades, it is now widely accepted that first and third parties may bring bad-faith claims against insurers. These bad-faith claims arise even though there is no privity of contract in third-party claims and even though there is no express statutory authorization of such claims. Bad-faith claims are particularly important in the administration of workers' compensation systems, where injured workers seek prompt and efficient adjustment of claims related to workplace injuries.

No one can seriously doubt that the potential of a bad-faith claim is a powerful deterrent that tends to prevent an insurance company from taking advantage of its position of power in the claims handling process. Bad-faith claims can affect an insurance company's bottom line, and no insurance company employee wants to be a decision-maker on a claim that exposes the employer to potentially substantial liability. Liability for bad-faith claims is an essential component of the effective control of insurance practices and protection of the insureds' interests.

In recent years, however, insurance companies are increasingly "outsourcing" insurance operations to third parties. Through such "outsourcing," the real functions of insurance may be performed by these

third parties. But the third parties are not subject to insurance regulation, and according to traditional rules related to lack of privity as well as narrow views of agency, other courts in the past have held that insurance intermediaries such as third-party administrators are not liable to the insured for bad-faith claims.

Some courts and scholars have regarded this situation as simply untenable. As noted by one insurance commentator,

> with reduced incentive to discharge their duties well, the other intermediaries frequently act negligently, recklessly, or even in bad faith, needlessly creating claims imbroglios that could be avoided, minimized, or streamlined.

Jeffrey W. Stempel, *The "Other" Intermediaries: The Increasingly Anachronistic Immunity of Managing General Agents and Independent Claims Adjusters*, 15 Conn. Ins. L.J. 599, 603 (2009) [hereinafter Stempel]. I think anyone who has fussed with a third-party administrator in an insurance context will know exactly what the commentator is talking about.

Depending on the method used to compensate the third-party administrator, the need for accountability for bad-faith conduct may increase. For instance, a compensation scheme that provides greater compensation to a third-party administrator as the claims paid decrease provides a powerful incentive to act in a fashion against the interests of the insured.

In recent years, a body of caselaw has developed addressing the question of whether third-party administrators should be liable to an insured for poor claims handling. Although some cases adhere to the traditional view affording immunity to third-party administrators and other intermediaries, a growing body of caselaw has come to a contrary result.

As will be seen below, no Iowa case has yet directly addressed the question of whether a third-party administrator may be held accountable for bad-faith torts by an insured. We thus have a choice in our common law development: should Iowa continue to adhere to traditional notions of privity or agency notwithstanding the growth of insurance intermediaries that have assumed many of the functions of an insurer? Or, instead, should Iowa follow the path of the cases that hold, in light of changed circumstances, that traditional approaches should give way to a more modern conception of the tort of bad faith? For the reasons expressed below, I would choose the latter course.

**II. Evolving Caselaw on Third-Party Administrators' Liability in the Insurance Context.**

**A. Introduction.** As Stempel has noted, the traditional view of some courts has been that a bad-faith claim could not be brought against a third party if there was no privity of contract. *See, e.g., Gruenberg v. Aetna Ins.*, 510 P.2d 1032, 1038–39 (Cal. 1973) (en banc); *see also* Stempel, 15 Conn. Ins. L.J. at 615 (discussing *Gruenberg*). In order to satisfy the privity requirement in bad-faith tort cases involving workers' compensation insurance, the courts engaged in a legal fiction, namely, that the employee should be considered a party to the contract between the insured and the insurer.

Privity notions have also sometimes been asserted in an effort to defeat a bad-faith claim against an intermediary insurance service provider. The argument is that as an agent of the insurer, the agent is liable only to its principal for potential shortcomings in the claims process.

Increasingly, however, just as privity was eliminated as an obstacle to first- and third-party bad-faith actions against an insurer, the traditional view that an agent of the insurer performing insurance

functions for the insurer cannot be held liable for bad faith has been challenged in a number of states. These case developments were well summarized by Professor Jeffrey W. Stempel in his presentation to the Association of American Law Schools Insurance Law Section's meeting in 2008, which was devoted to the examination of the role of insurance intermediaries. Stempel, 15 Conn. Ins. L.J. at 604–13; *see also* Hazel Beh & Amanda M. Willis, *Insurance Intermediaries*, 15 Conn. Ins. L.J. 571, 583–84 (2009). According to Stempel, "the greater near-autonomous role now shouldered by . . . [third-party administrators] and independent adjusters demands that they be treated under the law on a par with the insurers they represent." Stempel, 15 Conn. Ins. L.J. at 603.

**B. Negligence Claims Against Third-Party Insurance Providers.** The first challenge to the application of privity in the context of insurance adjusters arose in a series of cases where insureds claimed that the insurance adjusters were negligent in the handling of claims. As noted by Stempel, three cases illustrate the nature of the common law development. Stempel, 15 Conn. Ins. L.J. at 630–37.

In *Continental Insurance v. Bayless and Roberts, Inc.*, 608 P.2d 281, 286–87 (Alaska 1980), the Alaska Supreme Court considered a case where a subsidiary of the insurance company functioned as a claims department and was sued for its failing to adequately investigate a claim and keep its insured informed regarding case developments. The *Bayless* court held that because of the lack of a contract with the insured, no contractual claim could be brought. *Id.* at 287. The court held, however, that the adjuster "could be held liable for negligence arising out of a breach of the general tort duty of ordinary care." *Id.*

The New Hampshire Supreme Court came to a similar conclusion in *Morvay v. Hanover Insurance*, 506 A.2d 333, 334–35 (N.H. 1986). *See*

Stempel at 15 Conn. Ins. L.J. at 632–35. In this property damage case, an independent investigator hired to examine the cause of the fire determined it had a suspicious origin, leading to denial of the claim. *See* 506 A.2d at 333–34. The district court dismissed the policyholder's claim against the third-party investigator on grounds of lack of privity. *Id.* at 334. The *Morvay* court reversed, noting among other things that "investigators are under a general duty to use due care in the performance of their work." *Id.* at 334. The scope of the duty in *Morvay*, however, could be limited by limitations set by the contract with the insurer. *Id.* at 335. If the contract called for a $200 investigation, for example, the investigator's obligation was to use reasonable care in performing the work within the limits set by the insurer and advise the insurer if the investigator believed the scope of the investigation was too limited to come with a reliable result. *Id.*

The Mississippi Supreme Court considered the question of whether a third-party adjuster could be liable for negligence in *Bass v. California Life Insurance*, 581 So. 2d 1087, 1088 (Miss. 1991). *See* Stempel, 15 Conn. Ins. L.J. at 635. In *Bass*, the Mississippi Supreme Court rejected the contention that the adjuster could be liable for negligence to the policy holder. 581 So. 2d at 1090. But the Mississippi Supreme Court held that the adjuster could be held liable for gross negligence, malice, or reckless disregard of the rights of the policyholder if the adjuster had sufficient independent authority to rule on claims without insurer approval. *Id.*

These cases generally stand for the proposition that tort liability is distinguishable from contract liability and that agency principles do not provide complete immunity where an independent insurance service provider has wide autonomy in the determination of claims decisions. Of

course, in all these cases, the insured had no direct contract with the insurer or with the insurer's agent.

**C. Application of Bad-Faith Tort to Third-Party Insurance Administrators.** I now turn to consider cases that deal with a narrower proposition than negligence, namely, whether third-party administrators may be subject to bad-faith claims.

The development of the law in Oklahoma begins with the case of *Wolf v. Prudential Insurance Co. of America*, 50 F.3d 793 (10th Cir. 1995). In *Wolf*, the United States Court of Appeals for the Tenth Circuit considered whether a third-party administrator could be liable for bad-faith administration of claims under Oklahoma law. *Id.* at 797. The *Wolf* court noted under the facts of the case that plan administrator had primary control over administering the plan and received a percentage of the premiums paid for participant coverage. *Id.* at 797–98. The *Wolf* court concluded that although the plan administrator was a stranger to the contract between the insured and the insurer, that was not the end of the matter. *Id.* at 798. According to the *Wolf* court, the analysis "should focus more on the factual question of whether the administrator acts like an insurer such that there is a 'special relationship' between the administrator and insured that could give rise to a duty of good faith." *Id.* at 797.

It turns out that the Tenth Circuit's prediction of how the Oklahoma courts would decide the issue of potential liability of third-party administrators was accurate. In *Wathor v. Mutual Assurance Administrators, Inc.*, 87 P.3d 559, 561 (Okla. 2004), the Oklahoma Supreme Court considered a case where the employer offered employees access to health insurance through a self-funded insurance program, the Oklahoma County Health and Dental Plan. The Oklahoma County Health

and Dental Plan contracted with Mutual Assurance Administrators (MAA) to administer the plan. *Id.* The plaintiff claimed that the MAA, as third-party administrator, breached its duty of good faith in the administration of benefits. *Id.*

The *Wathor* court noted that the special relationship between an insurance company and the insured gave rise to a special relationship that created a nondelegable duty of good faith and fair dealing on the part of the insurer. *Id.* at 561–62. Thus, Oklahoma County Health and Dental Plan was potentially on the hook for bad faith. *Id.* at 562.

The *Wathor* court emphasized, however, that "the imposition of a nondelegable duty on the insurer does not necessarily preclude an action by an insured against a plan administrator for breach of an insurer's duty of good faith." *Id.* The *Wathor* court favorably cited *Wolf*, 50 F.3d at 797, for the proposition that the focus should be on the factual question of whether the plan administrator acted sufficiently like an insurer to give rise to a duty of good faith. 87 P.3d at 562. The *Wathor* court declared,

> In a situation where a plan administrator performs many of the tasks of an insurance company, has a compensation package that is contingent on the approval or denial of claims, and bears some of the financial risk of loss for the claims, the administrator has a duty of good faith and fair dealing to the insured.

*Id.* at 563. Notably, the holding in *Wathor* did not turn on substantive support from the Oklahoma's workers' compensation scheme. *See id.*; Stempel, 15 Conn. Ins. L.J. at 641 (discussing *Wathor*).

The Colorado Supreme Court considered whether a third-party administrator could be liable to a bad-faith claim from an insured in a health insurance context in *Cary v. United of Omaha Life Insurance*, 68 P.3d 462, 463 (Colo. 2003) (en banc). In *Cary,* the court considered a claim against a third-party administrator working for a health insurance

company. *Id.* The *Cary* court noted that it had decided several cases holding a third-party administrator potentially liable for bad-faith claims under workers' compensation laws. *Id.* at 466–67. But the *Cary* court noted that the court had also extended potential bad-faith exposure of third-party liability claims in settings other than workers' compensation. *Id.* at 467–68. For example, in *Transamerica Premier Insurance v. Brighton School District 27J*, 940 P.2d 348, 349 (Colo. 1997) (en banc), the Colorado Supreme Court concluded that a third-party administrator could be liable for bad faith in the context of suretyship. So, the *Cary* court reasoned, the notion of bad-faith liability was not limited to workers' compensation setting. *See* 68 P.3d at 468.

The *Cary* court recognized that an insurer had nondelegable duties. *Id.* at 466. But, the *Cary* court declared,

> [T]he existence of this non-delegable duty does not mean that a third-party claims administrator never has an independent duty to investigate and process the insured's claim in good faith. When the actions of a defendant are similar enough to those typically performed by an insurance company in claim administration and disposition, we have found the existence of a special relationship sufficient for imposition of a duty of good faith and tort liability for its breach—even when there is no contractual privity between the defendant and the plaintiff.

*Id.*

The *Cary* court recognized that a prior case, *Scott Wetzel Services, Inc. v. Johnson*, 821 P.2d 804, 805 (Colo. 1991) (en banc), was based in part on Colorado's workers' compensation statute and that those considerations were not present in the health insurance context of *Cary*. *See* 68 P.3d at 467. Yet, the *Cary* court concluded that the special relationship between an insured and a third-party administrator was sufficient to support a claim of bad faith. *Id.* at 468; *see* Stempel, 15 Conn. Ins. L.J. at 644–47 (discussing *Cary*).

A New Mexico appellate court considered the question of bad-faith liability for a third-party administrator in *Dellaira v. Farmers Insurance Exchange*, 102 P.3d 111, 112 (N.M. Ct. App. 2004). In *Dellaira*, an insurance company issued an automobile policy to an insured. *Id.* Another company "directed, handled, administered, and adjusted all claims." *Id.* When the claimant was dissatisfied with a property damage claim, she sought to join the management company as a defendant, employing a breach of good-faith theory. *Id.* at 113. The management company defended on the ground that there was no contract of insurance between the insured and the management company. *Id.*

According to the *Dellaira* court, "An entity that controls the claim determination process may have an incentive similar to that of an unscrupulous insurer to delay payment or coerce an insured into a diminished settlement." *Id.* at 115. Under these circumstances, the management company "acts as an insurer and is therefore bound within the special relationship created through the insurance contract." *Id.* The *Dellaira* court saw no reason why to limit bad-faith liability where "an entity related to or pursuant to agreement with the insurer issuing the policy has control over and makes the ultimate determination regarding the merits of an insured's claim." *Id.* The *Dellaira* court cited *Cary*, 68 P.3d at 478, for the proposition that an entity that controls the claim determination process may have an incentive similar to that of an unscrupulous insurer to delay payment or deny it altogether. *Id.*; *see* Stempel, 15 Conn. Ins. L.J. at 637 n.79.

At least one case in California supports the notion that a third-party administrator may be liable for bad-faith torts. In *Delos v. Farmers Group, Inc.*, 155 Cal. Rptr. 843, 846 (Ct. App. 1979), an insured sought to recover from a management company for bad-faith denial of a claim. The

management company did not have a direct contract with the insured. *Id.* at 848. But the *Delos* court concluded that a bad-faith claim would lie against the management company. *Id.* at 849. According to the *Delos* court, a contrary rule, among other things, would "deprive a plaintiff from redress against the party primarily responsible for damages." *Id.*; *see* Stempel, 15 Conn. Ins. L.J. at 647 n.104.

Finally, the Arizona Supreme Court considered the question of bad-faith liability of third-party administrators in *Sparks v. Republic National Life Insurance*, 647 P.2d 1127, 1137–38 (Ariz. 1982) (en banc). In this case, the Arizona Supreme Court considered the viability of a bad-faith claim against a company that was not in privity with the insured but provided insurance services. *Id.* The *Sparks* court concluded that lack of privity was not a bar to the claim and that the parties were jointly and severally liable for bad faith. *Id.* The *Sparks* court suggested it proceeded on a joint venture theory, but the traditional elements of a joint venture such as sharing profit and loss were not present in the case.[7] *Id.* at 1138. A later Arizona case relied on *Sparks* in finding a third-party administrator could be liable for a bad-faith claim even though there was no direct contract with the insured. *Farr v. Transamerica Occidental Life Ins. Co. of Cal.*, 699 P.2d 376, 386 (Ariz. Ct. App. 1984); *see* Stempel, 15 Conn. Ins. L.J. at 647 n.103.

---

[7]Similar loose language about a "joint venture" was utilized in *Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 959 (Nev. 1998) (per curiam). Like *Sparks*, the case does not appear to apply traditional joint venture requirements. *See id.* As noted by Professor Stempel, when the language is peeled back, the Nevada Supreme Court

> appears to be saying that where an intermediary acting within its authority makes a key coverage decision in place of the insurer, the intermediary should be liable like an insurer, particularly if the intermediary has economic incentives adverse to coverage and is involved in significant administrative operations for the insurer.

Stempel, 15 Conn. Ins. L.J. at 643 n.94.

There have, of course, been cases to the contrary. For instance, in *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 696 (Tex. 1994), a narrow majority of the Supreme Court of Texas declined to permit a claim that an adjusting firm and claims adjuster breached the duty of good faith and fair dealing in a workers' compensation context. The five-member *Natividad* majority stated that "the duty of good faith and fair dealing has only been applied to protect *parties* who have a special relationship based on trust or unequal bargaining power." *Id.* at 697 (emphasis added). The *Natividad* majority said that without a contract, there can be no special relationship and no duty of good faith and fair dealing. *Id.* at 698.

Four members of the Texas Supreme Court dissented. *Id.* at 700 (Gammage, J., concurring in part and dissenting in part). While the dissenters recognized there was no contract between the third-party administrator and the insured, there was a contract between the insurer and the third-party administrator to handle the claims of the insured's employees according to the terms of the insurance policy. *Id.* The *Natividad* minority noted that "[a] special relationship is one 'marked by shared trust or an imbalance in bargaining power.' " *Id.* at 701 (quoting *Fed. Deposit Ins. Corp. v. Coleman*, 795 S.W.2d 706, 708–09 (Tex. 1990)). The time for measuring the imbalance giving rise to a duty of good faith, according to the *Natividad* minority, was not at the time of contract formation but at the time of alleged denial or delay in payment. *Id.* at 700–01.

The *Natividad* minority noted prior caselaw where the Texas Supreme Court had noted that " '[a]n insurance company has exclusive control over the evaluation, processing and denial of claims' and can use that control in such a way that would subject the insured to 'economic calamity.' " *Id.* at 701 (alteration in original) (quoting *Aranda v. Ins. Co. of*

*N. Am.*, 748 S.W.2d 210, 212 (Tex. 1988), *overruled on other grounds by Tex. Mut. Ins. v. Ruttiger*, 381 S.W.3d 430, 433 (Tex. 2012); *Arnold v. Nat'l Cty. Mut. Fire Ins.*, 725 S.W.2d 165, 167 (Tex. 1987)). Here, the *Natividad* minority observed, the exclusive control that is so threatening is held not by the carrier, but by its agent. *Id.* The *Natividad* minority concluded that the reasoning for recognizing the duty to the covered employee's carrier extends as well to the carrier's agent. *Id.*

Another leading case cited by opponents of application of a bad-faith tort to insurance intermediaries is *Sanchez v. Lindsey Morden Claims Services, Inc.*, 84 Cal. Rptr. 2d 799 (Ct. App. 1999). In *Sanchez,* the failure of an independent adjuster to timely pay a valid $15,000 claim related to repair of an urgently needed dryer ordered by a customer of the insured led to a judgment against the insured for $1.325 million. *Id.* at 800. Remarkably, this case does not cite the usual privity and limitations of agency theories but instead fashions its approach based upon perceived public policy. *Id.* at 801–03; *see* Stempel, 15 Conn. Ins. L.J. at 657. The *Sanchez* court reasoned that if auditors in California have immunity, then third-party administrators should have immunity. *Id.* at 801–02. The *Sanchez* court warned that a third-party intermediary could face liability in excess of that faced by the principal. *Id.* at 802. *See generally* Stempel, 15 Conn. Ins. L.J. at 656–75 (discussing *Sanchez* and potential mischief of intermediary immunity).

### III. Iowa Caselaw on Bad-Faith Torts.

There have been a number of Iowa cases dealing with the question of bad-faith torts in the insurance context. A review of these cases demonstrates that the issue before us is one of first impression and that our precedent does not prevent us from choosing to join the evolving

caselaw extending potential liability, at least under some circumstances, to third-party administrators.

The first case of interest involving a first party bad-faith claim is *Dolan v. Aid Insurance*, 431 N.W.2d 790, 790 (Iowa 1988) (en banc). In this case, we recognized that an insured could bring an action in tort against an insurer for bad-faith conduct related to a claim made by its insured. *Id.* In a brief opinion, we distilled the arguments for and against the first party bad-faith tort as posing the question of

> whether the contractual relationship between the insurer and insured is sufficiently special to warrant providing the insured with additional protection and, relatedly, by determining whether the insured's remedies for the insurer's wrongful conduct are adequate without resort to the tort of bad faith.

*Id.* at 792. We noted in prior cases we were not required "to closely scrutinize the contractual relationship between the insurer and insured, or to evaluate the adequacy of the insured's remedies were the insurer to engage in wrongful conduct." *Id.* at 793.

We then went on to state that we were "convinced traditional damages for breach of contract will not always adequately compensate an insured for an insurer's bad faith conduct." *Id.* at 794. We then concluded that a bad-faith tort in the first-party setting was appropriate "to provide the insured an adequate remedy for an insurer's wrongful conduct." *Id.* We added that we "also" thought recognition of the tort was justified by the contractual relationship between the insurer and insured, noting that contracts of insurance are contracts of adhesion. *Id.*

The next case of interest is *Boylan v. American Motorists Insurance*, 489 N.W.2d 742, 742 (Iowa 1992). The question in this case was whether a first party tort of bad faith applied in the workers' compensation setting. *Id.* We noted that Iowa's workers' compensation statute imposes an

affirmative obligation to furnish medical and hospital supplies to an injured employee and that administrative regulations place the obligation on the insurer. *Id.* at 743. We also concluded that the penalty provisions of the workers' compensation statute were not designed by the legislature to provide an exclusive remedy for wrongful conduct by carriers with respect to the administration of workers' compensation benefit. *Id.* at 744.

In finding that the tort of bad faith did apply, we cited a number of "well-reasoned decisions" from other courts. *Id.* at 743. Some of the well-reasoned decisions found first-party bad faith supported not by the language of the workers' compensation statute but by independent duties owed to the claimants. *See id.* For instance, in one of the well-reasoned decisions, *Kaluza v. Home Insurance*, 403 N.W.2d 230, 236 (Minn. 1987) (en banc), the Minnesota Supreme Court found that the claim was an "independent tort" that was "not within the scope of the workers' compensation system." In another well-reasoned case, the Montana Supreme Court emphasized that "courts have upheld the right to bring an action for independent intentional torts because the tortious conduct, which gives rise to the action, does not arise out of the original employment relationship." *Hayes v. Aetna Fire Underwriters*, 609 P.2d 257, 261 (Mont. 1980). In the well-reasoned case of *Coleman v. American Universal Insurance*, 273 N.W.2d 220, 223 (Wis. 1979), *superseded by statute as stated in Aslakson v. Gallagher Bassett Services, Inc.*, 729 N.W.2d 712, 725 (Wis. 2007), the Wisconsin Supreme Court approved a bad-faith claim, noting that when the "claimed injury was distinct in time and place from the original on-the-job physical injury which was subject to the Compensation Act. . . . The Act does not cover the alleged injury." Thus, three of the well-reasoned cases endorsed by the *Boylan* court did not rely on statutory provisions in a workers' compensation statute to support a

bad-faith claim. Given the *Boylan* court's warm citation to these cases, there is no reason to think that statutory support is necessary for a valid bad-faith claim in the workers' compensation setting.

The next case in the line of authority is *Reedy v. White Consolidated Industries, Inc.,* 503 N.W.2d 601, 602 (Iowa 1993). In this case, we held that the tort of bad faith applied where the employer was self-insured. *Id.* at 602–03. We noted that in order to be self-insured under the Iowa workers' compensation act, the employer has to assume the status of an insurer. *Id.* at 603. For the purpose of bad-faith tort claims, there was no difference between an employer acting as an insurer and an employer's insurance company. *Id.* Although unstated in *Reedy*, the reason for the equivalence is that when an entity assumes the functions of an insurer, it has tremendous power over the claims of the insured regardless of its legal classification. *See id.* The *Reedy* holding embraces a functional rather than a formalistic approach to the tort of bad faith. *See id.* at 602–03.

The final Iowa bad faith case is *Bremer v. Wallace*, 728 N.W.2d 803, 804 (Iowa 2007). In *Bremer*, we considered a case where a workers' compensation claimant asserted a bad-faith claim against an employer who did not have a workers' compensation carrier and was not self-insured under Iowa's workers' compensation statute. *Id.* at 803–04. Here, the employer was not acting as an insurance company in evaluating and adjusting claims. *Id.* at 805–06. It was a naked entity with no insurance dimension. *Id.* The company plainly was not acting as the *functional equivalent of an insurer*, and for *that* reason, the tort of bad faith was not available. *Id.*

In *Bremer*, we took a functional approach. *Id.* We explained that in *Boylan* we recognized the tort of bad faith because the self-insured employer was "the substantial equivalent of an insurer." *Id.* at 805. Yet

in *Bremer* the adhesive nature of an insurance contract was not involved. *Id.* at 806. Further, we observed that the claimant could have foregone workers' compensation entirely and brought an ordinary civil action for damages against the employer. *Id.*

**IV. Discussion.**

In order to resolve the question before us, we must consider whether the notion of privity should be a bar to bad-faith claims against third-party administrators. We must also determine whether bad-faith claims against a third-party administrator can arise only expressly or by implication from a statute. If the answer to these preliminary questions is no, we must then determine whether the tort of bad faith applies to third-party administrators, and if so, in what settings.

It is clear to me that the question of privity is no bar to the bad-faith claim asserted in this case. In the workers' compensation context, the claim that privity exists between an employee and the employer's insurance carrier has always been a legal fiction. What is important in a bad-faith claim is the functional relationships that arise from insurance relationships, not privity of contract. *See, e.g., Cary*, 68 P.3d at 466–68; *Wolf*, 50 F.3d at 797–98; *Wathor*, 87 P.3d at 562–63; *Dellaira*, 102 P.3d at 115. Where third-party intermediaries have the power to affect the insurance interests of the claimant, they should be answerable in tort for their bad-faith actions.

We have seen this movie before. The " 'citadel' of privity" was vigorously defended in products liability cases even though the formal structure of the law did not comport with reality. Stempel, 15 Conn. Ins. L.J. at 605. In *MacPherson v. Buick Motor Co.*, 111 N.E. 1050, 1051–55 (N.Y. 1916), Justice Cardozo cut through the privity doctrine to allow injured parties to directly attack the underlying tortfeasor in a product

liability case, namely, the product manufacturer. Cardozo teaches us to see through the formalism of privity and address the realities on the ground to establish direct claims against those responsible for foreseeable injuries to innocent third parties. *See id.*

Because it is based on power relationships and the foreseeability of harm to the insureds, a claim of bad faith sounds in tort, not in contract. There are ample reasons to impose tort liability for bad-faith performance by a third-party insurance administrator. The power imbalance is just as great, and perhaps greater, as between an insurance company and the insured. Surely it is reasonably foreseeable that the insured will suffer potentially significant injury as a result of poor handling of a claim. If the third-party administrator performs the critical functions of an insurer—adjustment of claims with a financial incentive to delay or deny payments—a bad-faith claim should lie regardless of a web of formal documentation attempting to create artificial barriers between the insured and the people actually deciding their fate. It is "the logic of tort law," not contract, that gives rise to the bad-faith tort against insurance intermediaries. Stempel, 15 Conn. Ins. L.J. at 695.

An insurance intermediary "in essence stepped into the shoes of the insurer for these claims and thus logically should be held to the same legal standards governing the insurer." *Id.* at 624. Further, there is ample authority to hold the agent liable for its torts. The Restatement (Third) of Agency section 7.01 (2006) provides,

> An agent is subject to liability to a third party harmed by the agent's tortious conduct. Unless an applicable statute provides otherwise, an actor remains subject to liability although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment.

It seems to me there is ample reason to recognize a bad-faith tort where an insurance intermediary has the broad discretion to handle an insurance claim, where the harm to the insured from a bad-faith treatment of the claim is foreseeable, and where the intermediary acts with Professor Stempel's list of bad-faith practices: misrepresentation, dishonesty, deceit, gross negligence, recklessness, or sharp practices. Stempel, 15 Conn. Ins. L.J. at 715.

Another factor that drives me toward the conclusion that the tort of bad faith liability for insurance intermediaries should be recognized is the perverse incentives that can arise from the relationship between the insurer and the intermediary. The insurance company hires an intermediary to save money, of course. The intermediary will desire to maintain or strengthen its business, and that can be done by limiting claims payouts. Further, in order to be competitive, the insurance intermediary may resist proper claims handling and instead choose to arbitrarily limit its staff, thereby encouraging shortcuts in the claims process. Further, through use of a third-party intermediary, an insurer may maintain a warm public relations posture while intentionally employing a third-party administrator with the expectation that its agent will limit payouts through whatever means the agent might consider effective. These risks are further enhanced when compensation arrangements contain incentives that increase payouts as claims liability lessens. The interests of the insured do not figure into the financial equation, or at least not in a positive way.

There is nothing in our caselaw that precludes recognizing a bad-faith tort where an insurance intermediary is the functional equivalent of the insurer. None of our caselaw addresses the issue, and the mere fact that a tort was found under the facts presented in *Dolan, Boylan,* or *Reedy*

does not preclude the finding of a bad-faith tort in a somewhat different context. We employed a functional approach in *Bremer*, where we declared that because a naked employer was not "the substantial equivalent of an insurer," the bad-faith tort would not lie. 728 N.W.2d at 805. The converse should also be true, namely, that where a third-party administrator is the substantial equivalent of an insurer, a bad-faith tort should lie. *See* 1 Jeffrey W. Stempel, *Stempel on Insurance Contracts* § 10.02[A], at 10–17 (3d ed. 2006) ("The key determinant is whether the third party administrator is both acting like an insurer and subject to the danger that it will, like an insurer acting in bad faith, place its own economic interest ahead of the interests of the policyholder."), *as cited in Robertson Stephens, Inc. v. Chubb Corp.*, 473 F. Supp. 2d 265, 275 (D.R.I. 2007) (adopting functional approach in predicting Rhode Island law).

And, I do not think our caselaw somehow limits potential third-party claims to cases where obligations arise under workers' compensation statutes. In *Boylan*, the court cited affirmative duties under the statute of employers and insurers to provide medical benefits. 489 N.W.2d at 743. But the reference does not mean that bad-faith torts arise only when statutes support them. Indeed, the first party bad-faith claim in *Dolan* was not based on statutes. 431 N.W.2d at 794. Further, the *Boylan* court's citation of "well-reasoned cases" where bad-faith claims were found independent of the workers' compensation statutes cuts dead against reading some kind of statutory requirement into *Boylan.* 489 N.W.2d at 743. We should not assume that the references to "well-reasoned cases" in *Boylan* were that negligent. In any event, it has been the duty of common law courts to develop the scope of tort law and apply it in new contexts as circumstances change, not fossilize it as if the goal were placement in a legal history museum.

The majority stresses that an insurance company cannot delegate its duty to act in good faith and that the insurance company remains liable for the bad-faith actions of its agent. But tort law functions better if the person directly responsible for bad-faith acts is financial responsible for resulting damage.

> It is consistent with encouraging responsible conduct by individuals to impose individual liability on an agent for the agent's torts although the agent's conduct may also subject the principal to liability. Moreover, an individual agent, when liable to a third party, may be available as a source of recovery when the principal on whose behalf the agent acted is not.

Restatement (Third) of Agency § 7.01 cmt. *b* (2006). As noted by Professor Stempel, "It is discordant for the law to impose substantial obligations and potential liability on insurers as principals but then to simultaneously prohibit actions against their agents, agents who often have independent, almost unsupervised authority over the claims process." Stempel, 15 Conn. Ins. L.J. at 705. Further, a fact finder might find the degree of culpability for punitive damages to be greater against a third-party administrator who directly caused the problem rather than for an insurance carrier who is simply inattentive to the claims adjustment process performed by its agent.

I recognize, of course, that there is tired authority to the contrary. Much of it reflects older law that simply repeats legal formulas. Some of it seems oblivious to the basic tort principle that persons who are closest to wrongful conduct should be accountable to the wronged party for maximum deterrence.

Among the weakest cases rejecting a bad faith claim against third-party administrators is *Sanchez.* The *Sanchez* court compared liability of insurance intermediaries to auditors, 84 Cal. Rptr. 2d at 801–02, but the analogy is off the mark. Here, we are not dealing with endless liability to

unknown persons, but only liability to claimants or policy holders who are well known to the insurance intermediary.

Further, the claim of conflicting loyalties has been subject to criticism. The *Sanchez* court stated that since "[a]n adjuster owes a duty to the insurer who engaged him[,] [a] new duty to the insured would conflict with that duty, and interfere with its faithful performance. This is poor policy." *Id.* at 802. According to Professor Stempel:

> Actually, it is poor analysis by the court. The claims adjuster represents the insurer. By law, the insurer cannot give regard only to its own interests; it must not only consider the interests of the policyholder but give them at least "equal" consideration, a legal rule internalized in the custom and practice of insurance (where adjusters frequently describe their role as being required to "look for coverage" rather than "look for reasons to deny coverage"). The adjuster, like the insurer, therefore already has obligations to the policyholder. By immunizing the adjuster from a damages action, the *Sanchez* Court merely deprived the policyholder of a legal right that it already possessed, i.e., a right to have the adjuster act in the same manner as the insurer is required to act.

Stempel, 15 Conn. Ins. L.J. at 665–66.

In conclusion, one of the features of life in the 21st century is the increased bureaucratization and compartmentalization of business practices that, if accepted as legal barriers, tend to prevent direct accountability for wrongful conduct. Layers upon layers of bureaucracy impair responsiveness. In the workers' compensation arena, the employer hires an insurer and now the insurer in turn may hire a third-party administrator.

But where there is no direct accountability, service may deteriorate. We all know the potential scenario. The phone rings and no one answers. One is put on hold for hours. The right hand knows not what the left hand is doing. No one is familiar with the file. A person with decision-making authority cannot be found. Delay. Delay. Delay. This type of behavior

could lead to bad-faith exposure of an insurance company. The exact same type of behavior should lead to bad-faith exposure when a third-party administrator assumes the functions of the insurer.

I can think of no other area where it is more critical to have direct accountability than in insurance—where issues of extraordinary importance and urgency to the insured are increasingly handled by faceless and insulated third-party bureaucracies. To me, one of the essential functions of our tort system is to ensure that parties responsible for the foreseeable injuries that they cause through their misconduct, particularly those done in bad faith, are held directly accountable.

**V. Conclusion.**

For the above reasons, we should recognize a potential bad-faith claim against third-party administrators in the insurance context when they, in essence, undertake the essential functions of an insurance company as alleged in this case. This ordinarily requires a fact-based determination. I would so answer the certified question in this case.

Wiggins, J., joins this dissent.